THE UNITED STATES, APPELLANTS, *v.* THOMAS POWER'S HEIRS.

The twelfth section of the regulations of O'Reilly in 1770 required, that there should be an order of survey, a proces verbal by the surveyor of the province, three copies of the plat made out by him, one of which should be deposited in the office of the scrivener of the government, and Cabildo, a second delivered to the governor, and the third to the proprietor, to be annexed to the titles of the grant.

Where a grant was alleged to have been issued by the Spanish governor of Louisiana in 1781, and the only evidence of it was a copy taken from a notary's book, the title was invalid.

At the date of the grant, viz. 1st August, 1781, the Spanish governor of Louisiana was only the military commandant of that part of West Florida in which the lands granted were situated. He held the country by right of conquest. The Spanish laws had not been introduced into the country, and it was not ceded to Spain by Great Britain until 1783. The governor had therefore no authority to grant land in 1781.

Under the acts of Congress of 1824 and 1844, the District Court had no power to act upon evidence of mere naked possession, unaccompanied by written evidence, conferring, or professing to confer, a title of some description.

Under the various acts of Congress relating to land titles in that tract of country between the Iberville, the Perdido, and the thirty-first degree of north latitude, a complete title, unrecorded, is not barred against the United States, although it is barred against any private claim derived from the United States.

THIS was an appeal from the District Court of the United States for the Southern District of Mississippi.

It was the case of a petition, and amended petition, presented by the heirs of Thomas Power to the District Court for the Southern District of Mississippi, the first on the 15th of June, 1846, and the latter on the 11th of November, 1846, under the act of 1824, as revived and reenacted by that of 1844, claiming two very valuable islands, lying off the coast of the State of Mississippi, opposite the Bay of Biloxi.

The petition and amended petition, in substance, set forth, that, before the year 1760, Deer Island was occupied, with the verbal consent of the provincial authorities, by Pierre Laclede and Pierre Songy, who, on the 11th of September, 1760, sold all their rights to André Jung; that on the 7th of March, 1761, the said Jung made a similar sale to Ignace Brontin; and that, on the 8th of April, Brontin sold all his rights to Francisco Caminada.

That afterwards, on the 1st of August, 1781, Caminada received a grant of the said island called Deer Island, and another called Ship Island, from Bernardo de Galvez, then Spanish governor of Louisiana, which, it is alleged, then extended to the east beyond the said islands, as follows, viz.:—

"Don Bernardo de Galvez, Knight Pensioner of the royal and distinguished Spanish Order of Charles the Third, Colonel of the Royal Army, Governor, Intendant, and Inspector-General of the Province of Louisiana, &c., &c.

"Considering the foregoing acts performed by Don Francisco Caminada, which establish the right of possession which he has to the two islands, Deer and Ship, situated in front of the coast of Biloxi, recognizing them to have been made out agreeably to the order of survey, without causing prejudice to the neighbors adjoining, and without any opposition on their part; on the contrary, yielding, as it appears, their assistance to the said acts, approving them as we do approve them, therefor using the authority which the king has confided to us (*otorgamos*), we grant in his royal name, to the said Don Francisco Caminada, the possession of the aforesaid two islands, Deer and Ship; that as his own property he may dispose of them, and enjoy them, governing himself by said acts, and observing in every thing that which has been ordered for the settlement of the subject-matter.

"We give these presents, signed with our hand, sealed with the seal of our arms, and countersigned by the undersigned Secretary of his Majesty for this government.

"In New Orleans, on the 1st day of August, 1781.

"BERNARDO DE GALVEZ.

"By order of his Excellency.

"MANUEL ANDRES LOPEZ DE ARMESTO.

"Registered in book of records for said object, in the archives of my office, at folio 14.   New Orleans, November 8th, 1781.

"LEONARD MARANGE, *Notary.*"

The above, being a notarial copy, was the only evidence exhibited of the grant.   The original was lost.

The petition further stated, that on the 2d of December, 1806, Prosper Prieur, acting as the testamentary executor of Caminada, sold the two islands to Thomas Power, to whom the petitioners are heirs.

The amended petition further stated, that Caminada was an inhabitant of Louisiana, where he lived and died; that the Surveyor-General of Mississippi, acting under instructions of the Treasury Department, was executing, by a deputy, a survey of the islands, which had not been completed; but Deer Island was estimated to contain about two thousand acres, and Ship Island three thousand acres; that the petitioners had no knowledge or information of any adverse claim of title, save and except transient and temporary squatters, who from time to time had occasionally occupied parts of each island; and that they had no knowledge or belief that the title was ever presented by their ancestor to any board of commissioners whatever.

To this petition the district attorney filed his answer on the 13th of January, 1847, and insisted that the original petition was not filed within the time limited by the act of 1824 and the act of 1828 amendatory thereto; and that, the amended petition not having been filed until the 11th of November, 1846, the petitioners were barred and precluded from the institution of any suit against the United States, who relied upon the act of Congress of 1828 as limiting the right to one year. But if it should be decided that the limitation was two years, as provided in the act of 1824, they still insisted that the claim was barred, the amended petition not having been filed within two years from the passage of the act of 1844. The answer further denied the grant to Caminada in 1781, and the sale by his testamentary executor to Power. But if ever such a sale was made, they denied the right of the executor to make it, or to divest the rights of the heirs of Caminada, or pass any title to Power. They know nothing of the sale from Laclede and Songy to Jung, or of the sale to Caminada, and they required proof of the identity and rights of the parties claiming. They further denied that, at the time of the alleged grant in 1781, Caminada was an inhabitant of Louisiana, or that he lived and died there, or that any order of survey was executed for Caminada previous to the date of said alleged grant. The answer further stated, that the allegations in the petition and amendment were not sufficient, if true, to authorize a decree against the United States, and claimed the benefit of this objection in the same manner as if it had been relied upon by a demurrer.

Documents were filed and evidence was taken, but it is not material to state the substance of either.

In November, 1848, the District Court decreed, " that the claim and title of the petitioners to the two islands or parcels of land as before described be, and the same are hereby, confirmed to them in full property, the said original grant or title, in the opinion of said court, being good and valid, in virtue of the patent therefor, and in virtue of the treaty of St. Ildefonso, between Spain and France, of date October, 1800, and of the treaty of Paris of 1803, for the cession of Louisiana to the United States, and by the laws of nations, and by the acts of Congress hereinbefore referred to, under which this court has cognizance of said case.

" And it is further adjudged and decreed, that, the two several islands aforesaid having each its natural boundary, a survey thereof is therefore dispensed with, and that the petitioners' title be confirmed to them in the whole extent of the natural boundaries of said islands respectively; and if, on investigation, it shall appear that the United States has heretofore made sale of all or any part of said islands, then, as to such sales, the title hereby confirmed shall stand qualified and inoperative as to the specific land so sold, and, in place and stead of the land so sold, the petitioners shall be permitted to enter a like quantity of land within the same land district, which may be subject to sale at private entry." · ·

· The United States appealed to this court. .

The appeal was argued by *Mr. Crittenden* (Attorney-General), for the appellants, and submitted upon printed argument by *Mr. Henderson*, for the appellees.

*Mr. Crittenden* contended that the decree must be reversed, for the following reasons.

I. That on the 1st of August, 1781, the date of the alleged grant, Governor Galvez had no authority to make the grant of Ship Island and Deer Island to Caminada, the cession by Great Britain to Spain of that part of the country where they lie not having been made until the definitive treaty of peace of the 3d of September, 1783.

By the treaty of peace of 1763, between Great Britain, France, and Spain, it was agreed between France and Great Britain, " that, for the future, the confines between the dominions of his Britannic Majesty and those of his most Christian Majesty, in that part of the world, shall be fixed irrevocably by a line drawn along the middle of the River Mississippi, from its source to the River Iberville, and from thence by a line drawn along the middle of this river and the Lakes Maurepas and Pontchartrain to the sea; and for this purpose the most Chris-

tian king cedes in full right, and guarantees to his Britannic Majesty, the river and port of Mobile, and every thing which he possesses, or ought to possess, on the left side of the River Mississippi, with the exception of the town of New Orleans, and of the island in which it is situated, which shall remain to France." 2 Clark's Land Laws, Appendix, 258.

War having been declared by Spain against Great Britain, in 1779, Galvez proceeded with a considerable force to invade the British territory, and on the 14th of March, 1780, Fort Charlotte, on Mobile River, capitulated to him. Pensacola also afterwards capitulated to him, on the 9th of May, 1781.

The treaty by which Great Britain ceded the Floridas to Spain is dated the 20th of January, 1783.

The authorities to sustain the proposition are, 1 Kent, 169; Wheat. Elements, 572; Clark *v.* U. States, 3 Wash. 104; U. States *v.* Hayward, 2 Gallis. 501; Polk's Lessee *v.* Wendell, 9 Cranch, 99; Poole *v.* Fleeger, 11 Peters, 210; U. States *v.* Reynes, 9 Howard, 127; Davis *v.* Police Jury of Concordia, Ibid. 280; U. States *v.* Heirs of D'Auterive, 10 Howard, 609, decided the present term.

II. That there is no sufficient evidence of the execution of the alleged grant by Galvez, and, even if it were proved, the claim under it cannot be recognized, because the said alleged grant was not presented and recorded in pursuance of the fourth section of the act of the 25th of April, 1812, entitled " An act for ascertaining the titles and claims to lands in that part of Louisiana which lies east of the River Mississippi and island of New Orleans." 2 Stat. at Large, 715.

III. That if the grant to Caminada were valid, the petitioners have shown no title under it in Thomas Power, or in them as his heirs, as required by the act of 1824. The deed by Prieur to Power is not proved, and if it were, it is not shown that Prieur had any authority to make it.

IV. That the petitions were not filed within the time limited by law, and should have been dismissed.

*Mr. Henderson,* for the defendants in error, made the following points.

First Point. The title of petitioners rests on a full, complete, and perfect grant, — a patent, the original of which is filed in this case, and is sixty-nine years old. It was, and is, effective against all private persons, without further confirmation by the United States; and when, as now, rightfully exhibited against the United States, is equally valid against them, as perfect evidence of private property; and though a full legal title, — a " Spanish grant," — is within the direct cog-

nizance of the first section of the act of 1824, and the proper subject of this statutory jurisdiction in equity.   9 Peters, 733.

Second Point.   The title, out of the United States, being perfect, legal, and indefeasible, the only question remaining is the right of the petitioners to that title.

Our first position on this point is, that the United States have no right or jurisdiction to try the question of title between the heirs of Caminada, the grantee, and the heirs of Power, who claim as assignees of the grantee.   That, while it may be a matter of judicial propriety that the United States should require a *primâ facie* showing by the petitioners that they properly represent the " claim " in controversy, yet they have no right to demand an issue to try that question as between parties not before the court.   It is for the United States, under the law of 1824, to test the validity of the claim, and ascertain if the land in controversy is private property.   The State tribunals, where the lands lie, will adjudge the title between its citizens.   This inquiry cannot be thus incidentally invoked.   13 Peters, 375; 17 Louisiana, 479.

But, as the attorney of the United States in the court below pressed this issue upon us, it may be necessary we should sustain it here.   It involves the inquiry, that, as the petitioners claim title by a notarial act of conveyance, made to their ancestor in New Orleans, in 1806, by Prosper Prieur, as testamentary executor of Caminada, of the lands in question, is there proof enough in this case, in the absence of direct evidence of the last will of Caminada, and of Prieur's appointment to administer it, to sustain Prieur's act of sale to Power ?

And on this point we assume, that this act, being notarial and authentic, is *quasi* judicial, and will be presumed to have been done by proper authority.   9 Pet. 625; 3 Har. & McHen. 594; 6 Greenleaf, 145; Civil Code of Louisiana, 2233.   And at the date of this sale in 1806, the *locus in quo* formed part of the " Territory of Orleans."

And next, that this conveyance, being now forty-four years old, requires no proof to authenticate its due and proper execution, and that this rule of presumption of the due execution of the deed necessarily includes all the concomitant prerequisites to its execution.   1 Greenleaf's Ev. § 21, § 144; 14 Mass. 257; 6 Greenleaf, 145; 14 Johns. 182; 10 Ib. 475; 9 Ib. 169; 2 Hawks, 233; 3 Har. & McHen. 594; 7 La. 370; 2 How. Miss. 819; 5 Ib. 586; 6 Sm. & Mar. 284; 2 Rob. La. 84, 85; 1 Stark. Ev. 331, 332, note; 2 Stark. 924, notes 1, 2; 4 Wheat. 221; 7 Pet. 266; 2 How. U. S. 316; 7 Sm. & Mar. 159; 9 Pet. 674.

Third Point.   But if the presumptions of law in favor of the deed, from its age, &c., were not sufficient, we have, by the tes-

timony of Johnson and Janin, proved sufficient search for the mortuary proceedings on Caminada's estate, to lay the foundation of the secondary proof we have offered. 1 Greenl. Ev. § 84, and notes; 6 Greenl. 145; 14 Johns. 182. And we suppose the testimony of these witnesses, as to the lost record, — whereon the Spanish governor (the highest judicial officer of the province) had several times, by his signature, recognized the executorial capacity of Prieur, — and the abstract of the record filed with Johnson's deposition, quite satisfactory, as secondary evidence, that Prieur was in verity the executor of Caminada.

And as between Caminada's heirs and the heirs of Power, the title of the latter is now good by prescription. Power's heirs claim title, with the original grant in possession. This claim of title of unimproved lands draws after it possession commensurate with the grant. 2 Lomax's Dig. 132; 7 Sm. & Mar. 130.

So that their possession, and that of their ancestor, is now of forty-four years' continuance, without contest or molestation.

For all these reasons, we conclude the title derived by Thomas Power from the estate of Caminada is good and valid in this respect, and hence good to the extent claimed.

Mr. Justice CATRON delivered the opinion of the court.

In this case the petition sets forth that, before the year 1760, Deer Island was occupied, with the verbal consent of the provincial authorities, by Pierre Laclede and Pierre Songy, who on the 11th of September, 1760, sold their right of property thereof, and the improvements thereon, to Andre Jung; and that he made a similar sale to Ignace Brontin; that said Brontin sold the same to Francisco Caminada, who for a great length of time thereafter occupied said island; and that in 1806 Prosper Prieur, acting as the testamentary executor of Caminada, sold to Thomas Power, ancestor of complainants, two islands, known as Deer and Ship Islands, for which two islands Francisco Caminda received a complete grant, August 1st, 1781, from Bernardo de Galvez, then Spanish governor of the Province of Louisiana.

The answer denies all these facts, and requires proof.

This claim was presented to the District Court for the first time, never having been laid before a board of commissioners, or any step taken in regard to it, previously to its exhibition with the petition, June 15th, 1846.

In the District Court it was held that the grant for both islands was valid, and a decree was rendered against the United States.

No evidence was introduced to prove that such grant had been made, other than à Spanish copy certified by a notary, from the Spanish records in his office. The notarial record purports to have been made November 8th, 1781. This copy recites that it was founded on a petition of Caminada, asking for the grant in consideration of acts performed by him; and was made out agreeably to an order of survey and proces verbal, with the assent and assistance of the neighbors; which survey and proces verbal the governor approves, and on these proceeds to grant.

Assuming that the Spanish regulations had been adopted in Florida, then the rule governing surveyors, existing in 1781, is found in the twelfth regulation of O'Reilly of 1770. It requires the acts to be done which are recited in the grant, and directs that three copies shall be made of the plot and proces verbal by the surveyor of the province, one of which shall be deposited in the office of the scrivener of the government, and Cabildo; another shall be delivered to the governor, and a third to the proprietor, " to be annexed to the titles of the grant."

Nothing of the kind here appears. The only evidence is, that the grant was recorded on the notary's books, whether in the proper office, to which a copy of the plan of survey and proces verbal should have been returned, according to O'Reilly's regulation, does not appear, although we suppose it was the proper office, where one copy should have been deposited by the surveyor; yet no authority existed for recording the grant there, so far as we are informed: and if there had, no complete title was recorded, as such title had to be accompanied by the plot and proces verbal, describing the land granted. On this unsupported and mutilated copy alone the decree of the District Court is founded.

Our next inquiry is, whether Galvez, who purports to have made the grant, had power to do so on the 1st of August, 1781.

1. By the laws of nations, in all cases of conquest, among civilized countries, having established laws of property, the rule is, that laws, usages, and municipal regulations in force at the time of the conquest remain in force until changed by the new sovereign. And this raises the question of fact, whether the king of Spain had changed the laws of England existing in the province, by virtue of which the public domain could be granted to private owners, as early as August 1st, 1781, and in their stead adopted the laws of Spain prevailing in Louisiana; as, if the Spanish king had not done so, his officers had no power to grant. Having nothing to govern us in ascertaining this fact but the history of Florida and of its conquest by Spain, it becomes necessary to examine that history, in so

far as the same may be judicially noticed, and has any bearing on the claim before us.

It was first discovered, inhabited, and governed by France as part of Louisiana, and by that power ceded to Great Britain. By the treaty of peace of 1763, the boundary between France and Great Britain was declared to be through the Iberville, Lakes Maurepas and Pontchartrain, to the sea; and the French king ceded the river and port of Mobile, and every thing he possessed on the left side of the River Mississippi, with the exception of the town of New Orleans and the island on which it is situated. Deer and Ship Islands were therefore included in this cession to Great Britain.

The king of Spain, by another article of the same treaty, ceded to Great Britain Florida, with the fort of St. Augustine and the Bay of Pensacola, as well as all that Spain possessed on the continent of North America to the east or southeast of the River Mississippi.

In 1763 the king of Great Britain by proclamation created the governments of East and West Florida. The government of West Florida was bounded to the southward by the Gulf of Mexico, including all islands within six leagues of the coast, from Appalachicola to Lake Pontchartrain; to the westward by the Mississippi, Lakes Pontchartrain and Maurepas; to the north by the thirty-first degree of north latitude; and to the east by the River Appalachicola. In 1764, the northern line of Florida was extended by Great Britain from the Appalachicola, at the thirty-first degree, to the mouth of the Yazoo, on the Mississippi River.

Unzaga, having been appointed Captain-General of the Caraccas, was, by a royal schedule of the 10th of July, 1776, directed to surrender provisionally the government and intendancy of Louisiana to Bernardo de Galvez, colonel of the regiment of Louisiana.

Spain having declared war against Great Britain on the 8th of May, 1779, on the 8th of July following a royal schedule was issued, authorizing the Spanish subjects in the Indies to take part in the war.

With the official account of the rupture, Galvez, who had hitherto from July 1, 1777, exercised the functions of governor *pro tempore*, received the king's commission of governor and intendant. The commission is dated 8th May, 1779, the day of the declaration of war, and is confined to the Province of Louisiana.

Galvez, on receipt of this commission, determined to attack the British possessions in his neighborhood, and accordingly did so. On the 21st of September, 1779, Baton Rouge, Natchez,

and other posts in the same part of the country, capitulated to him.

His success was rewarded by a commission of brigadier-general, 1780.

Early in January, 1780, he proceeded to attack Fort Charlotte, on the Mobile River, which capitulated, 14th March, 1780. Shortly afterwards he proceeded to attack Pensacola, but his transports having been dispersed, and some of them lost by a storm, he went back to Havana, whence he had set out.

In 1781, he was promoted to the rank of *mariscal de campo*.

On the 28th of February, 1781, he left Havana, again to attack Pensacola, and on the 9th of March landed his troops, and on the 9th of May the British forces capitulated. By express terms of the capitulation, the whole province of West Florida was surrendered to Spain; Don Arthur O'Neil, an Irish officer in the service of Spain, was left in command at Pensacola.

The alleged grant by Galvez to Caminada bears a subsequent date, viz. New Orleans, 1st August, 1781; less than three months after the capitulation of Pensacola.

In the caption of the grant, Galvez is styled Colonel of the Royal Army, Governor and Intendant of the Province of Louisiana.

Mazange, who certifies the copy as registered in his office, was appointed clerk of the Cabildo, 1st January, 1779, and held the office until January, 1783.

The preliminary articles of peace between Spain and Great Britain were signed at Paris, 20th January, 1783. By the third article it is stipulated that " his Britannic Majesty will cede to his Catholic Majesty East Florida, and his said Catholic Majesty will retain West Florida."

At the date of the grant, Spain held in military occupation the country to the east of the island of Orleans, under the capitulation of Pensacola, liable to be divested by reconquest or surrender by a treaty of peace.

Nothing is found in these historical details indicating that the Spanish laws had been introduced into Florida, and superseded those of England, and that civil power had been vested in Galvez to grant lands. As this could only be done directly by the king, all presumptions are opposed to such supposition. The grant purports to have been made within eighty days after the capitulation of Pensacola; a time, at that day, hardly sufficient to have heard from Spain, after the account of the capitulation reached there, had there been no hostile British fleet intervening to intercept intercourse. But what would seem to be conclusive of the fact is, that Galvez did not assume to grant

by any new authority, but did so under his commission as governor of Louisiana; and as this bore date before the conquest, and did not extend to Florida, no such power could be exercised by force of that commission. And not having power to grant merely as a military officer in command, the grant could not be made by him, and is void. Nor can we suppose that Galvez made any grant of the date of August 1, 1781, as such assumption would be a reproach on his high standing and intelligence.

2. The grant having no force, the next question is, whether complainants have shown any equity entitling them to a decree. As to Deer Island, it is alleged that those under whom Caminada claimed had possession by verbal permission from government for many years under France and Great Britain. But no proof of the fact was made; and if there had been such proof, it would be of no value, as the District Court did not possess power to act on evidence of naked possession unaccompanied by written evidence conferring, or professing to confer, a title of some description.

As respects Ship Island, it is not pretended that any equitable claim to it existed antecedent to the date of the grant.

3. If we had found this to be a legal and perfect title, then the rule laid down in the case of Reynes, at the last term, would apply, and compel us to dismiss the petition for want of jurisdiction, because the act of 1824 did not confer power on the District Courts to decide on perfect grants; but as a mutilated title-paper is here set up, unaccompanied by a plan of survey and proces verbal, which the grant refers to as a part thereof, and as an equity standing in advance of the grant is relied on by the petition to one of the islands, it is our duty to act on the mutilated title, and on the assumed equity, and ascertain whether the claim as set forth by complainants can be sustained.

We cannot declare in advance, that there is no equity in the pretensions set up by complainants, as the act of 1824 imposes on us the duty " to hear and determine all questions arising in the cause relative to the title of the claimants "; that is to say, in all cases where the title was not perfect according to the laws of Spain, when our government acquired Louisiana, and by a final decree to settle and determine the question of validity of title. And this must be done, regardless of the fact whether the equity set up be weak or strong in our judgment.

In the case of Reynes there was a perfect and formal Spanish grant set forth by complainant, and admitted to exist as set forth by the United States; and the only question was, whether jurisdiction in the Spanish government was wanting over the

country where the land lies at the time the grant bears date. No question arose on the face of that title, but on the extraneous fact, that the land lay beyond the Spanish jurisdiction. The cases are widely different.

4. It was earnestly insisted in argument, that this claim is barred, because it had not been recorded as prescribed by Congress. And as this question is prominently presented in the record, and has been fully examined, it is deemed proper to decide it.

By the first section of the act of the 26th of March, 1804 (1 Land Laws, 112), " all that portion of country ceded by France to the United States under the name of Louisiana which lies south of the Mississippi Territory, and of an east and west line to commence on the Mississippi River at the thirty-third degree of north latitude and to extend west to the western boundary of the said cession, shall constitute a territory of the United States under the name of the Territory of Orleans."

The limits to the east from the Mississippi River extended to the Perdido, that river having been claimed by the United States as the boundary of Louisiana on the east from the execution of the treaty of cession.

By the act of the 2d of March, 1805 (1 Land Laws, 122), " An Act for ascertaining and adjusting the titles and claims to land within the Territory of Orleans and District of Louisiana," the Territory of Orleans was to be laid off into two districts, in such manner as the President should direct, in each of which he should appoint a register, who, together with two other persons to be by him also appointed, should be commissioners for the purpose of ascertaining the rights of persons claiming under any French or Spanish grant, or under the first two sections of the act. The first section applies to claims under any duly registered warrant or order of survey obtained from the French or Spanish government. The second applied to persons who, with permission of the proper Spanish officer, and in conformity with the laws, usages, and customs of the Spanish government, had made an actual settlement on a tract of land not claimed by virtue of the preceding section.

The act further provides, that every person claiming lands by virtue of any legal French or Spanish grant made and completed before the 1st of October, 1800, may, and every person claiming lands by virtue of the first two sections of the act, or by virtue of any grant or incomplete title bearing date subsequent to the 1st of October, 1800, shall, before the 1st of March, 1806, deliver a notice to the register stating his claims, together with a plat, and deliver to the register for the purpose of being recorded every grant, order of survey, deed, convey-

49

ance, or other written evidence of his claim. Provided that, where lands are claimed by virtue of a complete French or Spanish grant, it shall not be necessary to have any other evidence recorded except the original grant or patent, and the warrant, or order of survey, and the plat, but the other evidence should be deposited with the register; " and if such person shall neglect to deliver such notice in writing of his claim, together with a plat as aforesaid, or cause to be recorded such written evidence of the same, all his right, so far as the same is derived from the two first sections of this act, shall become void, and thereafter for ever be barred; nor shall any incomplete grant, warrant, or order of survey, deed of conveyance, or other written evidence which shall not be recorded as above directed, ever after be considered or admitted as evidence in any court of the United States against any grant derived from the United States."

This last provision does not apply to complete titles, (as Caminada's assumed to be,) but to claims under incomplete titles, and claims arising from possession and cultivation under the first and second sections of the act.

It is not very clear what was comprehended within the limits fixed by the President as the eastern district. In a letter from the Secretary of the Treasury to the register at New Orleans, dated 30th March, 1805 (2 Land Laws, 666), it is said, " for the present all that part of the territory which lies east of the Mississippi," together with certain parishes on the west bank, will belong to the eastern division.

By the third section of the act of the 2st of April, 1806, supplementary to the act of 1805 (1 Land Laws, 139), the time fixed for delivering notices and evidences of claims is extended to the 1st of January, 1807, but the rights of persons neglecting shall be barred, and the evidences of their claims never afterwards admitted as evidence, in the same manner as had been provided by the fourth section of the act of 1805.

This provision, therefore, only applied to incomplete titles and claims under possession and cultivation, and not to complete grants.

By the fifth section of the act of the 3d of March, 1807 (1 Land Laws, 153), " An Act respecting claims to land in the Territories of Orleans and Louisiana," the time for delivering notices and evidences of claims was further extended till the 1st of July, 1808, but the rights of persons neglecting, " so far as they are derived from, or founded on, any act of Congress," shall ever after be barred and become void, and the evidence of their claims never afterwards be admitted as evidence in any court

of law or equity whatever. This provision, also, it will be seen, did not touch complete grants.

By the act of the 23d of April, 1812, "An Act giving further time for registering claims to land in the Eastern District of Louisiana," persons (actual settlers on the land which they claimed) were allowed until the 1st of November, 1813, to deliver notices and evidences of their claims, with the same provision as to neglect as in the act of 1807.

Complete grants were therefore still untouched.

It is proper here to mention, that, in the summer of 1810, a number of citizens of the United States, who had removed to the neighborhood of Bayou Sarah, took the fort of Baton Rouge from the Spanish authorities, and, in a convention which afterwards met, declared their independence and framed a constitution.

Upon receiving information that the Spanish troops had been driven from Baton Rouge, Mr. Madison, then President, issued a proclamation on the 16th of October, 1810, setting forth that the territory south of the thirty-first degree of north latitude east of the Mississippi as far as the Perdido, of which possession had not yet been delivered to the United States, had ever been considered and claimed by them as part of the country they had acquired by the treaty of 1803. He therefore announced that he had deemed it right and necessary that possession should be immediately taken of the said territory in the name and behalf of the United States, and the governor of the Territory of Orleans was directed to carry the views of the United States into execution. Governor Claiborne accordingly did so, and on the 7th of December, 1810, hoisted the flag of the United States at St. Francisville, without opposition, and announced the event by a proclamation, and subsequently established in this new part of the Territory of Orleans the parishes of Feliciana, East Baton Rouge, St. Helena. St. Tammany, Biloxi, and Pascagoula.

No attempt was made to occupy the town of Mobile, nor any part of the country around it, and the Spanish garrison of Fort Charlotte was left undisturbed; Governor Claiborne having been specially instructed not to take possession by force of any post in which the Spaniards had a garrison, however small it might be.

By an act of the 12th of February, 1813, the President was authorized to occupy and hold all that tract of country called West Florida not now in possession of the United States. 3 Stat. at Large, 472.

In pursuance of this act, possession was taken, by order of the President; the governor of Louisiana having done so by the President's directions.

These proceedings having placed the United States in the actual possession of West Florida as far as Mobile, Congress on the 25th of April, 1812, passed " An Act for ascertaining the titles and claims to lands in that part of Louisiana which lies east of the River Mississippi and island of New Orleans." 1 Land Laws, 208. By the first section of this act it is enacted, that for the purpose of ascertaining the titles and claims to land in that tract of country which lies south of the Mississippi Territory, east of the River Mississippi and island of New Orleans, and west of the River Perdido and a line drawn with the general course thereof to the southern boundary of the Mississippi Territory, the lands within the said limits shall be laid off into land districts between which Pearl River shall be the boundary, and for each of which districts a commissioner shall be appointed.

By the fourth section it is enacted, that every person claiming lands in the said tract of country, by virtue of any grant, order of survey, or other evidence of claim whatsoever, derived from the French, British, or Spanish governments, shall deliver to the commissioner a notice in writing, stating the nature and extent of his claim, together with a plat, and shall deliver to the commissioner, for the purpose of being recorded, every grant, order of survey, deed, conveyance, or other written evidence of his claim, and the same shall be recorded. " Provided that, where lands are claimed by virtue of a complete French, British, or Spanish grant, it shall not be necessary for the claimant to have any other evidence of his claim entered at large on the record, except the original grant or patent, together with the order of survey and the plat; all the other conveyances or deeds may be abbreviated in the entry, but the chain of title and the date of every transfer shall appear on the record. And, if such person shall neglect to deliver such notice in writing of his claim, together with the plat (in case the lands claimed shall have been surveyed), as aforesaid, or cause to be recorded such written evidence of the same within the time and times as aforesaid, his claim shall never after be recognized or confirmed by the United States; nor shall any grant, order of survey, deed, conveyance, or other written evidence, which shall not be recorded as above directed, ever after be considered or admitted as evidence in any court of the United States against any grant which may hereafter be derived from the United States."

The plain meaning of this provision is, that no Spanish claim not recorded shall be evidence in cases where the same land has been granted by the United States, and a contest arises between the two grants.

This act, it is apprehended, is the first provision under which the grant to Caminada could have been brought forward; as at the time of its passage the United States had come into actual possession of the country where the islands are situated.

By the act of 18th April, 1814, supplementary to the act of 1812, the time for delivering notices and evidences of claim was extended to the 1st of September, 1814. 1 Land Laws, 247.

The act of 3d March, 1819, " An Act for adjusting the claims to land and establishing land-offices in the districts east of the island of New Orleans," confirms claims reported under the act of 1812, and confers on the registers and receivers of Jackson Court-House and St. Helena Court-House the same powers as the commissioners east and west of Pearl River had. By the sixth section it is declared, that every person claiming land, whose claims had not before been filed, " shall be allowed until the 1st of July, 1820, to deliver notices in writing and the evidences of their claims to the register of the land-office at Jackson Court-House and at St. Helena Court-House, and the notices and evidences so delivered within the time limited by this act shall be recorded in the same manner as if the same had been delivered before the commissioners closed their said registers."[1]

By the act of 24th May, 1828, " An Act supplementary to the several acts providing for the adjustment of land claims in the State of Mississippi," it is provided, that claimants of lands within that part of the limits of the land district of Jackson Court-House below the thirty-first degree of north latitude, whose claims had been presented to the commissioners or to the register or receiver under the act of 3d March, 1819, which had not been reported to Congress, or had not been presented to the said commissioners or register and receiver, were allowed to the 1st of January, 1829, to present their titles and claims to the register and receiver at Jackson Court-House, whose powers and duties shall be, in relation to the same, governed by the provisions of the acts before recited, and of the act of 8th May, 1822.

Although the act of 1812 is not directly cited in the act of 1828, yet it was meant to be included, as it was under that act that the first commissioners were appointed. The register and receiver were appointed under the act of 1819. Neither the act of 1812, nor any succeeding act, barred a claim to land not surveyed and sold by the United States; and Ship and Deer Islands remaining unsold, the claim before us stands unaffected by the legislation of Congress. That such was the obvious understanding of Congress when the act of 1824 was passed, under which we are exercising jurisdiction, appears by

the eleventh section of that act. It protects purchasers under the United States, but not the government itself, as to any lands not surveyed and sold.

But aside from this consideration, for the reasons previously stated, we adjudge the claim to be invalid, and order the petition to be dismissed.

### Order.

This cause came on to be heard on the transcript of the record from the District Court of the United States for the Southern District of Mississippi, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said District Court in this cause be, and the same is hereby, reversed and annulled, and that this cause be, and the same is hereby, remanded to the said District Court, with directions to dismiss the petition of the claimants