Howry, J.,
delivered the opinion of the court:
This is an action for recovery of rent for the use and occupation of certain buildings and a tramway in the Philippine Islands. The amount claimed by the amended petition is $110,000.
The property was owned by the order of Dominican friars, who made a contract for its sale to one Richard Henry Andrews, a British subject, now deceased. Andrews acquired title August 8, 1898, and transferred his interest to the company incorporated as the plaintiff. The authorities of the United States came into the possession of the premises after the insurgents (who had previously taken forcible possession), and occupied and used the parcels set forth in the findings. No compensation or rental has been paid for the use, but at no time has any claim of title or equity been asserted by the United States. Claims for rent of the propertjr were recognized as just, but doubts as to the true ownership having been suggested by various military and civil officers of the Government, compensation has been withheld until the doubt as to the title could be determined.
The case is not analogous to that of Hill v. United States (149 U. S., 593), where title was asserted to land under tide water and damages claimed for use and occupation of the United States in the erection and maintenance of a light-house, the Government claiming a permanent right to the use of the land “as against plaintiff or any other person.”
*237 Nor is there any claim bere as in Langford's case (12 C. Cls. R,., 338; affirmed in 101 U. S., 341), where it appeared that in taking possession oí the premises the officers of the United States took the property under a claim that it belonged to the Government. The taking here was not in perpetuity, as it was there, but for temporary purposes, out of which the relation of landlord and tenant appears to have arisen.
There is no express contract, under these circumstances, for the Government to pay, growing out of the alleged doubt as to the true owner. But in cases where the entry and occupation is by permission of the owner, and the express contract is wanting, the law implies a promise to pay a reasonable rent. (Carpenter v. United States, 17 Wall., 489.) When the entry was made, as in this instance, plaintiff companjr claimed the ownership and acquiesced in the use and occupation by claiming compensation. ' Government'thus appropriated to public use private property, asserting no title or claim of right to the possession, but, on the contrary, disclaiming interest. This is enough to raise the implied promise to pay the rental value to the true owner. (United States v. Great Falls Mfg. Co., 112 U. S., 645; 124 id., 581; United States v. Lynah, 188 id., 445.)
Defendants have not denied by plea the corporate existence of plaintiff, and it is the established practice in this court that a plea of the general issue admits plaintiff’s capacity to sue. (Hebrew Cong. v. United States, 6 C. Cls. R., 244; Ins. Co. v. United States, 22 Wall., 99.) But inasmuch as the requests of the defendants for certain findings of fact go to the jurisdiction of the court, we consider the defenses set forth in the requests as if these matters were specially pleaded.
It is alleged that the cause must fail because the company, though actualty incorporated, was not legally so, and, whether legally incorporated or not, that the company or- association had no power to acquire or manage real property in the islands, because the companj- was and is a foreign association.
Want of jurisdiction is claimed because, as we understand the oral argument, the right to bring the action did not include individuals in the colonies of those nations, although the citizens or subjects of the same nations domiciled at home had the right to sue.
*238 Beginning with these propositions in their inverse order, because the alleged foreign character of the plaintiff is more intimately connected with the matter of jurisdiction, we find that the contention mainly rests upon an opinion given in April, 1900, by the attorney-general of the Philippine Islands to the military governor, in which it was stated that, accord; ing to the articles incorporating, plaintiff, a British subject, and a person whose nationality was not stated and a third person representing an association at Haiphong, China, organized the company, and the deduction was drawn that the association was foreign because the concessionary and true owner was organized by foreign friars resident in Tong King. It is further stated in the opinion, that their representative in the capital stock was also a foreigner,' whose company was composed of individuals domiciled in a French colony, and being the possessor and owner of a large majority of the shares of stock the joint company organized by this capital made the company foreign, and not being domestic the company could not acquire title to the realty in question.
Section 1068 of the Revised Statutes provides that—
“Aliens, who are citizens or subjects of any government which accords to citizens of the United States the right to prosecute claims against such government in its courts, shall have the privilege of prosecuting claims against' the United States in the Court of Claims, wliereof such court, by reason of their subject-matter and character, might take jurisdiction.”
We are unable to see any reason why an alien, whether citizen of Prance or subject of Spain, possessing the right to prosecute claims in this court under the statute cited should be denied the right to sue if residing in the colonies of such Governments. No reason has been assigned for any such discrimination in the application of the meaning and intent of the statute which admits aliens to the jurisdiction of the court.
The statute makes no distinction between natural and artificial persons. A corporation created by any government whose citizens might under the statute bring suit could likewise maintain its action in the corporate character of its creation. So, if this plaintiff is a foreign association, or can for the purposes of this action be deemed foreign, its cause of action would be as much within the jurisdiction of'the court *239 as if brought by citizens of France or subjects of Great Britain or Spain.
But is the company a foreign association? The incorpo-rators appear by the articles to be the representatives of an association of Haiphong, China, Andrews, a British subject, and Baldwin, a merchant, resident of Manila. The corporate capital was fixed at $5,000,000, and it was recited that Andrews brought and transferred to the company its principal item in conveying to it the title to the eight estates which he acquired from the province of the Holy Rosary of Dominican Fathers August 8, 1898, appraised at $4,230,000. Baldwin’s nationality is not stated, but the presumption is that he was an American.
By the civil code of the Philippines the following were constituted judicial persons, to wit: (1) Corporations, associations, and institutions of public interest, recognized by law, whose personality begun from the instant they were validly established; (2) associations of private interests, civil, commercial, or industrial, to which the law grants proper personality independent of that of each member thereof. (Art. 35.) The associations mentioned in the second clause are governed by the provisions of their articles of association. (Art. 36.) The civil capacity of corporations is governed b}^ the laws creating or recognizing them; that of associations by their by-laws. (Art. 37.) Judicial persons could acquire and possess propert}*" of all kinds. (Art. 38.)
By the Code of Commerce, foreigners and companies incorporated abroad could trade in the Philippines. Provisions follow showing the manner of incorporation. (Arts. 15,16,17, 21.) Article 21 provides in subdivision 12 that foreign associations desiring to establish themselves or to create branches in Spain or the Philippines shall present and have recorded in the registry, in addition to their statutes and the documents prescribed for Spanish corporations, a certificate issued by the Spanish consul stating that said companies have been established and authorized according to the laws of their respective countries. And b}" the Code of Civil Procedure the domicile of civil and commercial corporations was fixed in the town designated as such in the articles of incorporation or .in their bir-laws. (Art. 66.)
*240 The last provision necessarily relates to domestic corporations organized under the laws of the country.
The domicile of such a corporation is that fixed in the statutes, though the companj^ had agents in other places. (Code of Commerce, note, art. 151, War Dept. Trans., 46.)
The establishment of a branch in a place other than the domicile mentioned in the articles of incorporation did not affect such domicile. (Code of Civil Procedure, art. 66, note.)
The national character of a -corporation arises from the jurisdiction in which and in accordance with the laws of which it is organized. If plaintiff was foreign its charter must have emanated from some source foreign to the place of incorporation, and its character as a foreign company must have been impressed upon it elsewhere than the place of its actual organization, followed by the consular certificate prescribed by the code. But it was organized according to the local law and domiciled at the place of incorporation. All the requirements of the municipal law in such cases made and provided with reference to recording and registration were met. The consular certificate was wanting because the company was purely local and no certificate of a consul was necessary. It would seem, then, that the company was domestic if anything.
This is so unless the recitals in the articles as to the presence of foreigners shall operate to make the company foreign. Does this make any difference?
For purposes of jurisdiction it is conclusively presumed that all the stockholders are citizens of the State which, by its laws, created the corporation. (B. & O. R. R. Co. v. Harris, 79 U. S., 65; Muller v. Dows, 94 id., 444; St. Louis and San Francisco Railway, 161 id., 545.) In an early case it was held that a corporation chartered bjT the laws of the United States may be composed of aliens or of citizens of a different State from that of defendant and yet maintain its action within the spirit and terms of the jurisdiction of the national tribunals under the Constitution. (Bank of the United States v. Deveaux, 5 Cranch, 61, 88.) So, regardless of its origin, an averment that a corporation was composed of aliens or citizens of a different State would sustain the jurisdiction if not traversed. Though in a later case it was said *241 that the opinion in Bank v. Deveaux had gone too far (Louisville, Cincinnati & Charleston Railroad v. Letson, 2 How., 497), yet, in reviewing various cases on this subject, it was declared to be an indisputable legal presumption that a State corporation, when sued, or suing in the circuit court, is composed of citizens of the State which created it. This is so, though such corporation include an alien who might be benefited through the corporate character of associations of which he is a part, and consequently a corporation organized under the laws of a State is a citizen of the United States within the meaning of an act (March 3, 1891, c. 538) w-hich gives this court jurisdiction of the claims of certain citizens of the United States. (United States v. Northwestern Express Co., 164 U. S., 686.)
Besides the presumption of citizenship in such cases, being one of law, that can not be defeated by allegation or evidence, nothing appears against the legality of this organization which included a British subject and the representative of a Chinese company. The presumption must be that alienage of some of the incorporators was and is not a bar to the legality of a corporation under the municipal law which granted to this company the right to do business as a domestic corporation.
Under a statute conferring benefits exclusively upon citizens of the United States aliens may possibly not acquire rights by means of articles incorporating them together as a State corporation, but that question not being involved in this case, no opinion is expressed upon it. We only hold that in the controversy between the present parties the fact that the articles of association show the presence of foreigners is not sufficient to change a domestic company into a foreign body politic, and that the national character of the company which brings this action must be determined from the local jurisdiction which gave it being irrespective of the individual incorporators.
Assuming, however, that the presence of foreigners among' the individual incorporators made the company foreign in character, what rights, if any, did plaintiff acquire in the matter of holding land?
*242 Because of the view we have taken that the company was domestic, if anything, the inquiry upon this branch of the case is not deemed necessary except in the most general way.
The civil code provided that:
“Foreigners enjoy in Spain the rights which the civil laws grant to Spaniards, with the exception of the provisions of article 2 of the constitution of the State or in international treaties.” (Art. 27.)
Article 2 of the constitution referred to is as follows:
“Aliens may freety establish themselves in Spanish territory, exercise therein their industries or any profession for whose exercise the laws do not require special titles (or diplomas) to be issued by the Spanish authorities.”
These probab^ refer to lawyers, doctors, architects, etc.
Judicial persons as well as natural persons, though foreigners, were equally recognized as possessing full civil rights in Spain. Thus corporations, institutions, and associations recognized by law and domiciled in Spain enjoyed the Spanish nationality, provided they possessed the character of judicial persons in accordance with the provisions of the code. Associations domiciled abroad had in Spain the consideration and the rights fixed by' treaties or special laws. (Art. 28.) A royal decree of November 17, 1852, specified and regulated the privileges of aliens and made a clear distinction between /civil rights and political rights. It provided that aliens should not participate in the political rights of Spaniards, nor exercise municipal rights in the election of councils, nor hold municipal offices, nor be employed in the State offices unless they expressly renounced for themselves and their children exemption from military service and all foreign protection in whatever related to their service in office.
The power to acquire, hold, and dispose of real property was secured to all “judicial persons” by the civil code (arts. 28 and 38, supra), among which were all associations recognized bylaw. (Ib., 35.) The right to hold and dispose of real property was a civil right.
But it is said that a rule established by what was known as the Maura decree forbade plaintiff, if a foreign corporation, to hold property.
*243 This decree was promulgated February 13, 1894. Its purpose was to create greater facilities for the acquisition of State lands, because at that time 200,000 applications for the acquisition of public lands were on file awaiting action. , The title to large portions of the lands of the Crown then held by private individuals was uncertain, and the further object was to legalize the possession of these lands. (Rep. of the minister to the Queen.) This report, with reference to foreigners, states that the law then governing the acquisition of property by foreigners not resident in the islands should be maintained, while, however, taking into account cases where special acquisitions might properly be made in view of large enterprises which might assist. colonization. The law designated what should be considered as alienable Crown land. It referred to applications made and pending, contained regulations for the grants or conveyances of public lands, regulated proceedings to be taken by actual occupants of public lands who had not yet obtained title, and contained regulations relating to communal and township lands. In the regulations for the grant and conveyance of the Crown lands it was provided that the persons in whose favor adjudications should be made should reside in the Philippines and be inscribed in the proper register; that in case such persons changed their residence or domicile to any other country they must sell the property they acquired to a resident; that in cases of succession heirs not residents and not possessing the other legal requisites were required to- sell, as were the original holders. Then followed the statement that the acquisition of properties in the Philippines was absolutely prohibited to foreign associations, companies, or enterprises, whether or not domiciled in the islands. This portion of the subdivision of the article from a law relating solely to the acquisition, holding, and disposition of public lands was clearly not meant to include the acquisition and tenure of private lands. This subdivision does not repeal by implication the provisions of the civil code which specifically permitted the acquisition and holding of real property by foreign corporations.
It. must be noted that the civil code only continued to follow the Spanish law concerning foreigners. That law provided that aliens might acquire and possess real property, *244 exercise the industries, and take part in all enterprises not reserved by existing laws and regulations to Spanish subjects. (Art. 18, law of November, 1852; art. 38, law of July 4, 1870.)
The Maura decree was an administrative law for the benefit of the state. It ought not to be held to abrogate a civil right by implication because civil rights are not regulated by administrative laws. The decree was not meant to regulate civil rights, but pertained solely to the acquisition, classification, and tenure of state lands. As the civil code conferred upon foreigners equality of civil rights' with natives, and specifically conferred upon foreign corporations domiciled in Spain the nationality of Spain, we do not think that a law relating to lands of the Crown superseded or was intended to supersede rights conferred bjr the civil code.
A more serious question is presented in considering the competency of the local authorities to create the plaintiff a corporation. If that authority did not exist, then plaintiff acquired no legal existence and has none now.
The company was- organized under the Spanish law claimed by plaintiff to be in force in the Philippine Islands after the treaty of Paris. Articles incorporating plaintiff were executed in January, 1900, and were duty recorded in the Mercantile Registry of Manila soon thereafter. The treaty which ceded the islands to the United States was signed December 10, 1898, and ratified the following April. During this time Manila was under the military control of the United States, and the municipal law of the place was administered and enforced by the military government, except as modified by the military authorities. When the treaty ceding the islands was ratified the sovereignty of the United States became absolute. Translations of the laws then in force in the ceded territoiy were published and issued by authority of the Secretary of War. This included the civil code and the code of commerce, which regulated rights of property and prescribed rules for commercial transactions and embraced the rules under which commercial associations are formed and regulated. The translation recited that the code of commerce was in force. (Division of Customs and Insular Affairs, October, 1899.) Some changes were subsequently made (laws of *245 Philippine Commission, 1901), as, for example, the repeal of a chapter of the code (p. 132), but no' changes affecting the methods of incorporating' companies had been made at the time of the incorporation of this association.
If, at the time of the cession of the archipelago, only such laws were continued in force as did not involve a sovereign grant — the right to any kind of a charter under local regulations being included — as contended by the defendants upon the eminent authority of the late civil governor of the ceded territory, then the laws granting corporate rights became entirely inoperative after the cession and a check was immediately and indefinitely put upon the formation of partnerships, general and limited, the organization of joint stock companies and associations of different kinds incident to the commercial and industrial life of the ceded country and as necessary there as in other parts of the world.
The general rule of international law in regard to all conquered or ceded territory is that the old laws continue until repealed by the proper authorities. (Woolsey’s Int. Law, sec. 161.)
In conquered or ceded countries that have already laws of their own, the king maj^ alter and change those laws; but till he does actually change them, the ancient laws of the country remain, unless such as are against the law of God, and in the case of an infidel country. ' (1 Blackstone, 107, Lewis’s ed.)
In Chew v. Calvert it ivas held that the laws of Spain continued in force in Mississippi until after the territorial government was organized under act of Congress April 7, 1798. (1 Walk., Miss. Ii., 56.)
In Norris v. Harris (15 Cal., 253) it was held that the presumption that the common law prevails in those States original^ colonies of England does not extend to States like Florida, Louisiana, and Texas, where organized governments existed at the time of their accession to the country, which laws remained in force until abrogated and new laws promulgated.
In Am. Ins. Co. v. Canter (1 Pet., 511), while discussing the effect of the cession of territory by treaty, Chief Justice Marshall said:
“On such transfer of territory it has never been held that the relations of the inhabitants with each other undergo any *246 change. Their relations with their foi’mer sovereign are dissolved and new relations are created between them and the government which has acquired their territory. The same act which transfers their country transfers the allegiance of those who remain in it; and the law, which may be denominated political, is necessarily changed, although that which regulates the intercourse and general conduct of individuals remains in force until altered by the newly created power of the State.”
In matters relating to the collection of revenue, however, the case of Cross v. Harrison (16 How., 164) established the rule that duties collected under the tariff- laws of the United Stafes between February 2, 1848, the date of the treaty of peace between the United States and Mexico, and November 13,1849, when a revenue collector was appointed in California b3r the President, according to act of Congress passed March 3, 1845, were lawfully collected. The substantial effect of this case was to declare that the revenue laws of the United States became applicable. This case related to a public right.
The decisions in what are known as the Insular Cases (De Lima v. Bidwell, 182 U. S., 1, and Downes v. Bidwell, id., 244, et al.) relate to the concrete question of the uniformiti" of imposts, duties, and excises throughout the United States. They leave untouched the interpretation put by the President upon the effect of the military occupation with respect to private rights of person and property b}r the municipal laws prevailing there, subordinate, however, to the administrative government of the military — of which hereafter.
But the doctrine declared in Am. Ins. Co. v. Canter that the municipal laws intended for the protection of private rights and designed to secure the peaceful use and enjoyment of private property, or affecting the possession and transfer of such property, continued in force until altered or repealed by direct action of the new sovereignty, has been followed in United States v. Percheman, 7 Pet., 51; Delassus v. United States, 9 Pet., 117; United States v. Power, 11 How., 570; Leitensdorfer v. Webb, 20 How., 176; Palmer v. Low, 98 U. S., 15, and Chic. R. I. & P. R. R. v. McGlinn, 114 U. S., 542.
Special privileges, grants, or franchises flowing from the grace and pleasure of the sovereign in favor of some one particular person or bodjr distinguished from the general body *247 of the inhabitants are the things forbidden. It needs no reference to international law to say that any exercise of authority by the ceding sovereignty, after cession, could not have force with reference to such things as grants of land, or the bestowal of special franchises, such as the construction of roads, the keeping of ferries, and the erection of bridges with the right to collect toll upon them. These are grants by the authority of the State as particular privileges which look to the promotion and protection of the public good. But the municipal laws promulgated during the time the ceding authority existed and which are generally .recognized as necessaiy to the peace and good order of the communitj'' remained in full force and effect. Any other rule would hold in abeyance civil functions with respect to the use, enjoyment, and transfer of private property that would lead to results harmful to the inhabitants of the ceded territory and injurious to the best interests and authority of the new sovereign as well. This is something that has not been tolerated in modern times.
During the military occupation, and while a state of war yet existed between the two countries, the United States expressly recognized the continuance of the municipal laws of the conquered territory. The milita^ occupancy, though absolute and supreme, operated only upon the political conditions of the people without affecting private rights of person and property. Under these municipal laws partnerships were formed and joint-stock associations organized, and the ordinary and commercial transactions of the country proceeded, as nearly alike as the changed conditions would admit, as before. And after peace was declared the authority of the United States was directed to be exerted for the security of the persons and propert}7 of the people of the islands and for the confirmation of all their private rights and relations. The municipal laws of the territories in respect to these private rights and property were to bo considered as continuing in force, to be administered by the ordinary tribunals as far as practicable. (Presidents’ Messages, 10 Kichardson, 209, 220.)
This action of the Government merely emphasized the distinction existing between the municipal law, which regulated and protected the relations of the many, and the power of the sovereign, which only could grant franchises and special *248 privileges to the few. Such distinction was indicated in the local law classifying- judicial persons into corporations, associations, and institutions of public interest-, and associations of private interest, civil, commercial, or industrial. (Art. 35, Civil Code.) Pursuant to which it was provided that the civil capacity of corporations should be governed by the laws creating or recognizing them — that is to say, by their charters or gifts of franchises — while the civil capacity of private association was to be determined by their by-laws. (Art. 38,. id.)
The things prohibited were grants or concessions of public or corporate rights or franchises for the construction of public or quasi public works, such as railroads, tramways, telegraph and telephone lines, waterworks, gas works, electric-light lines, etc. (Executive order of December 22, 1898, id., 221.)
Independent of all these considerations plaintiff was a de facto association with the right of possession and the right to give lawful discharge for the use and occupation of its property. Governor Taft recognized this, going so far as to say that plaintiff could probably hold title, or, in any event, payment to it would be a complete defense to any claim made by the Dominican friars, because their dealings with the corporation would be held to estop them from denying its corporate existence. (Off. Letter to the Maj. Gen., Com. Div. of the Philippines, March 16, 1903.) We are unable to see why plaintiff’s collection of the rent due to it as an association would not be a lawful acquittance of any claim against the occupants of the property. The incorporation was compatible with the new order of things. The association was given life by the same municipal law that was authorized to create either a general or a limited partnership. This law we have seen was neither abrogated nor impaired by the change of government. No other person or association of .persons could rightfully claim the rental value, and payment to this company does not put the Government in danger of paying twice. It is true that if plaintiff had been dispossessed the new occupants could set up against a claim for rent an outstanding-title in another, because that would not preclude the occupants from showing a better outstanding title. But this defendants have not done and do not propose to do further *249 than to say that the real parties in interest are the friars, who are not claiming.
Even if a state of insurrection had existed at the place of incorporation the validity of certain judicial acts (which would include the incorporation of this association under the municipal law) would be valid. The force of acts not hostile in their purpose or method of enforcement to the authority of the National Government and not impairing the rights of citizens appears in Horn v. Lockhart (17 Wall., 580). The line between valid acts such as those governing the course of descents and regulating the conveyance and transfer of property, and invalid acts proceeding from an unlawful government against the authority of the rightful sovereign, was clearly drawn' in Home Ins. Co. v. United States (8 C. Cls. R., 449), which was affirmed by the Supreme Court in an opinion by Mr. Justice Strong, published in 10 C. Cls. R., 145. The analogy of these cases to that at bar-is close enough to establish with greater reason the rule that the internal concerns of the new inhabitants were not paralyzed by the transition from one government to another, nor suspended until the -authoritjr taking over the ceded territory ordained something to take the place of the established local law. This accords with the enlightened practice of civilized nations to recognize existing laws to the extent that the military and civil authority of the Conquering nation shall not operate to disorganize society or discontinue civil government with respect to the purely domestic affairs of the people of new acquisitions.
The proof does not establish the amount set forth in the amended petition. The testimony was taken with reference to the amount claimed by the original cause of action in Mexican silver dollars, to wit, $73,425; but the Spanish-Filipino peso, which was not quite so valuable as the Mexican dollar in its silver weight, had become the currency of the islands before hostilities between Spain and the United States, and the amount of the judgment must be the value of this local currency in lawful coin of the United States. We find this value to be $31,939.87, for which judgment will be éntered for plaintiff.
Weldon, J., was not present when this case was argued and took no part in its decision.