## COBB v. UNITED STATES.

### No. 12746.

United States Court of Appeals
Ninth Circuit.

June 11, 1951.

As Amended on Denial of Rehearing
Aug. 27, 1951.

Frederick W. Kant, Allan H. Fish, Alvin J. Rockwell, John R. McDonough, Jr., Richard G. Logan and Brobeck, Phleger & Harrison, all of San Francisco, Cal., for appellant.

Frank J. Hennessy, U. S. Atty., Rudolph J. Scholz, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before STEPHENS, ORR and POPE, Circuit Judges.

ORR, Circuit Judge.

The controlling question on this appeal is whether the federal government has, by virtue of the Federal Tort Claims Act, 28 U.S.C.A. §§ 2671–2680, consented to be sued on a tort claim arising out of an accident which took place in October, 1948, on the island of Okinawa. In brief, the question is whether Okinawa was at that time a "foreign country" within the meaning of 28 U.S.C.A. § 2680(k) which excludes from the scope of the Act: "Any claim arising in a foreign country."

Appellant brought this action in the United States District Court for the Northern District of California to recover damages from the United States for personal injuries suffered in an automobile accident in Okinawa, where he was then employed by a contractor engaged in military construction. The accident allegedly resulted from the negligence of an unknown employee of the United States in leaving an unlighted crane parked on the road after dark.

Okinawa is an island in the Ryukyu Archipelago, south of the main Japanese islands and south of 30° north latitude. Prior to World War II, according to the Department of State, Japan was "acknowledged internationally to be the sovereign"

of the Ryukyus.[1] During World War II the United States conquered Okinawa, and has continuously occupied the island since that time. In September, 1945, the Department of State announced the policy of limiting "Japan's sovereignty" to the home islands.[2] In furtherance of this policy the Supreme Commander, Allied Powers, in 1946 promulgated an order reading in part as follows: "1. The Imperial Japanese Government is directed to cease exercising, or attempting to exercise, governmental or administrative authority over any area outside of Japan, or over any government officials and employees or any other persons within such areas."[3] "Japan" was defined to exclude those of the Ryukyus south of 30° north latitude, such as Okinawa.

◼ Since its conquest Okinawa has had no independent legislative, executive or judicial government except the United States Military Government, which still controls the island.[4] The United States operates naval, military and air bases on Okinawa, and a congressional committee has expressed a purpose of the United States to maintain these bases indefinitely.[5] Yet the ultimate fate of the island is not settled.[6] The United States has expressed no intention to annex the island, to return it to Japan, or to establish it as an independent state. The island is not under United Nations trusteeship, or the Far Eastern Commission.[7] No peace treaty has yet been concluded with the former sovereign, Japan.

On these facts the District Court held that Okinawa was a "foreign country," relying on three District Court decisions,[8] and on United States v. Spelar, 1949, 338 U.S. 217, 70 S.Ct. 10, 94 L.Ed. 3. In the

1. The quotation is taken from a letter to appellant's counsel dated April 12, 1949, from the Acting Legal Adviser of the Department of State.

2. Exhibit 6 purports to be a copy of a statement entitled: "8. United States Initial Post Surrender Policy for Japan, Advance Echelon, APO 500, 23 September 1945, Department of State Radio News Bulletin, 22 September 1945 (Intercepted by GHQ Signal Service) White House." This statement of policy sets forth the ultimate objectives of the United States as being, in general, to establish a peaceful and responsible Japanese government. The statement proceeds: "The objectives will be achieved by the following principal means: a. Japan's sovereignty will be limited to the islands of Honshu, Hokkaido, Kyushu, Shikoku, and such minor outlying islands as may be determined in accordance with the Cairo Declaration and other agreements to which the United States is or may be a party * * *."

3. Order of Supreme Commander, Allied Powers, entitled: "189. Memorandum concerning Governmental and Administrative Separation of Certain Outlying Areas from Japan," dated 29 Jan. 1946.

4. See Rubenstein, Magistrate Courts in Okinawa: A Contribution to Justice in the Ryukyus, 36 A.B.A.J. 1011 (1950).

5. Report of Committee on Armed Services, House of Representatives, 81st Congress, 1st Sess.

6. A letter to appellant's counsel dated April 12, 1949, from the Acting Legal Adviser of the Department of State, states in part: "No formal determination has been reached concerning the final disposition of Okinawa. No treaty of peace with Japan has yet been concluded, nor has any action been taken to place Okinawa under the International trusteeship system established under the Charter of the United Nations."

7. The letter cited in note states in addition: "Okinawa is not controlled by the Far Eastern Commission, which was established pursuant to the Agreement of Foreign Ministers at Moscow on December 27, 1945; the United States has been in charge of the military occupation of the Ryukyus."

A letter to appellant's counsel dated April 20, 1949, from the Political Affairs Officer, Trusteeship Division, United Nations, states in part: "I am directed to inform you that the question of placing Okinawa under trusteeship has not been raised in any organ of the United Nations, and, as far as is known, there have been no representations or statements to the United Nations on this question by any representative of the United States."

8. Brewer v. United States, D.C.N.D.Cal. 1948, 79 F.Supp. 405 (Okinawa); Brunell v. United States, D.C.S.D.N.Y.1948, 77 F.Supp. 68 (Saipan); Straneri v. United States, D.C.E.D.Pa.1948, 77 F.Supp. 240 (Belgium);

Spelar case the Supreme Court held that the Tort Claims Act did not grant governmental consent to be sued for a tort which occurred on Newfoundland territory leased by the United States. The court rested this conclusion on two tests applied to the Spelar claim: (1) Whether the leased territory was "territory subject to the sovereignty of another nation", 338 U.S. 217, 219, 70 S.Ct. 10, 11, and, (2) whether the liability asserted was one "depending upon the laws of a foreign power", 338 U.S. at page 221, 70 S.Ct. at page 12. We think it appropriate here to apply these tests to plaintiff's claim:

1. The Sovereignty of Another Nation.

█ In defining the term "foreign country," as used in 28 U.S.C.A. § 2680(k), the Supreme Court observed: "We know of no more accurate phrase in common English usage than 'foreign country' to denote territory subject to the sovereignty of another nation." 338 U.S. 217, 219, 70 S.Ct. 10, 11. In support of this definition the Court quoted with approval the statement of the Court in De Lima v. Bidwell, 1901, 182 U.S. 1, 180, 21 S.Ct. 743, 746, 45 L.Ed. 1041: "A foreign country was defined by Mr. Chief Justice Marshall and Mr. Justice Story to be one exclusively within the sovereignty of a foreign nation, and without the sovereignty of the United States." Since Newfoundland was unquestionably subject exclusively to the "sovereignty" of Great Britain, the leased territory in Newfoundland was held to be part of a "foreign country."

█ When applied to Okinawa, however, the test of "sovereignty" affords no

such satisfactory conclusion. At the outset, it must be assumed that "sovereignty is never held in suspense." [9] The question, therefore, is whether Japan has lost her sovereignty over Okinawa and, if so, to what power that sovereignty has passed. In the event the United States' occupation of Okinawa were of a clearly provisional character designed simply to maintain order on the island until Okinawa could be returned to a responsible Japanese government, it could be said that Japan did not lose her "sovereignty" over the island but had been merely deprived temporarily of the power to exercise some of the rights of sovereignty.[10] This theory would be particularly applicable to the Japanese home islands because in those islands a native Japanese government has been permitted to exercise most of the normal powers of government in matters of domestic administration, subject to the supervision of the Supreme Commander. However, the United States has expressed no intention of returning Okinawa to a Japanese government. On the contrary, the announced policy of the State Department is to place the island outside the "sovereignty" of Japan, and the Supreme Commander has ordered that the Japanese government refrain from attempting to exercise any governmental or administrative authority there. These circumstances divest Japan of all sovereignty over the island.[11]

Sovereignty, therefore, must have passed to some other people. Had the United States announced the objective of establishing an independent state of Okinawa it could be said that, in a sense, sovereignty

---

Appellee cites for additional support two other cases allegedly decided by the District Courts: Dunn v. United States, N.D.Cal., and Smith v. United States, No. 28865. Appellee cites no report of these decisions and fails to state when they were decided, or what court decided the Smith case, which allegedly dealt with Saipan. Appellee does not state what was involved in the Dunn case.

It does not appear that any of these cases were appealed.

9. United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 317, 57 S.Ct. 216, 219, 81 L.Ed. 255.

10. See telegram from Secretary Hughes to Ambassador Herrick, dated March 5, 1923, quoted in part in 1 Hackworth, Digest of International Law (1940) p. 146; Cf. De Lima v. Bidwell, 182 U.S. 1, 194, 21 S.Ct. 743, 45 L.Ed. 1041, citing Fleming v. Page, 1850, 9 How. 603, 13 L.Ed. 276;

Mr. Justice Hunt, concurring in City of New Orleans v. Steamship Co., 1874, 20 Wall. 387, 396, 399, 22 L.Ed. 354.

11. Cf. United States v. Rice, 1819, 4 Wheat. 246, 254, 4 L.Ed. 562.

passed to the people of Okinawa, the government being administered for the people by the occupant as a sort of trustee.[12] The record indicates, however, that no such policy has been adopted. The ultimate fate of Okinawa has not yet been decided. It cannot be said that the loss of "sovereignty" over the island by Japan vests the "de jure sovereignty," in the traditional sense, in the natives of Okinawa.

■ By evicting the Japanese and affirmatively withdrawing Okinawa from the sovereignty of Japan, the belligerent occupants acquired the exclusive power to control and govern the island. This power, although perhaps acquired in the name of the Allied Powers, is lodged exclusively in the United States. The United States Military Government now governs, and will continue indefinitely to govern, the island of Okinawa, free from interference by other powers.[13] The will of the United States is in fact the "supreme will"[14] on Okinawa. The United States has therefore acquired, and still retains, what may be termed a "de facto sovereignty."[15]

■ However, the traditional "de jure sovereignty" has not passed to the United States. The conqueror does not acquire the full rights of sovereignty merely by occupying and governing the conquered territory without a formal act of annexation or at least an expression of intention to retain the conquered territory permanently.[16] It does not necessarily follow, therefore, that Okinawa is not a "foreign country" within the meaning of the Tort Claims Act. So long as the ultimate disposition of that island remains uncertain, it offers a persuasive illustration of the observation that "the very concept of 'sovereignty' is in a state of more or less solution these days."[17]

In short, the traditional test of sovereignty, when applied to the status of Okinawa, admits of no conclusive answer. While the traditional test furnishes a useful tool of construction in the usual case it cannot control the interpretation of § 2680(k) in the unusual case. Whether the term "foreign country" in the Tort Claims Act includes Okinawa must be decided in the way that accords more clearly with the central purpose of the Act.

12. See 1 Hackworth, Digest of International Law, 156–57 (1940); Cf. Neely v. Henkel (No. 1), 1901, 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448.

13. In addition to the letters cited in note 7, supra, appellant's counsel introduced a letter dated (apparently) May 5, 1949, from the Executive Secretary of the Office of the Secretary of Defense, stating in part: "Whereas Japan is occupied and controlled by the Allies, Okinawa is governed solely by the United States."

14. United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 317, 57 S.Ct. 216, 81 L.Ed. 255.

15. Cf. Thorington v. Smith, 1868, 8 Wall. 1, 19 L.Ed. 361; Cross v. Harrison, 16 How. 164, 189, 14 L.Ed. 889; Fleming v. Page, 1850, 9 How. 603, 614, 13 L. Ed. 276; United States v. Rice, 1819, 4 Wheat. 246, 254, 4 L.Ed. 562; 1 Hackworth, Digest of International Law 128 (1940); 1 Moore, International Law Digest 14; 1 Foulke, International Law § 57 (1920); Colby, Occupation under the Laws of War, 26 Col.L.Rev. 146, 158 (1926).

Since "de facto sovereignty," as the term is used here, arises out of the bare power of the occupying authority, the possible interest of the other Allied Powers in the government of Okinawa does not affect this conclusion.

16. See 1 Hyde, International Law § 106 (1922); 2 id. § 907; 1 Hackworth, Digest of International Law 427 (1940); Rules of Land Warfare 273, 275, Basic Field Manual (FM 27–10, 1940) 73–74, quoted in part in 6 Hackworth, Digest of International Law, pp. 385 and 389 (1943). Cf. 2 Garner, International Law and the World War 77 (1920); Ochoa v. Hernandez, 1913, 230 U.S. 139, 154, 33 S.Ct. 1033, 57 L.Ed. 1427. But, cf. United States v. Rice, 1819, 4 Wheat. 246, 254, 4 L.Ed. 562.

17. Mr. Justice Frankfurter, concurring in United States v. Spelar, 1949, 338 U.S. 217, 222, 224, 70 S.Ct. 10, 13, 94 L.Ed. 3. See 1 Foulke, International Law 69, n. 11 (1920); 1 Oppenheim, International Law 101–08 (1905); 1 Hackworth, Digest of International Law § 11 (1940); Aufricht, On Relative Sovereignty, 30 Cornell L.Q. 137 (1944); Colby, op. cit. supra, note 14, p. 155.

## 2. The Laws of a Foreign Power.

The Federal Tort Claims Act was the product of an effort to reform the cumbersome private bill procedure which has encumbered congressional activities in the past. Despite the desirability of relieving Congress as far as possible of the responsibility for compensating private persons for damages caused by governmental activities, wherever the damages might occur, Congress explicitly excluded from the coverage of the Act claims "arising in a foreign country." The Supreme Court, after studying the congressional hearings and reports, has concluded that the purpose of this exception was to avoid subjecting "the United States to liabilities depending upon the laws of a foreign power." [18] Since liability under the Act is to be determined under the law of the place where the tort occurs, 28 U.S.C.A. § 1346(b), the exception of § 2680(k) was phrased in terms of the place where the claim arises. To decide whether Okinawa is a "foreign country," as the term is used in the statute, it is necessary to determine whether the law of Okinawa, which controls this claim, is the law "of a foreign power."

Prior to World War II, the law of Okinawa was Japanese law, administered and promulgated by the Japanese sovereign. Regardless of invasion, occupation,[19] or cession,[20] that law continues in force until it is changed.[21] The parties have failed to show any change and it must be presumed that the original Japanese law is still in effect.

[11] However, Okinawa law is not the law "of a foreign power" in the sense that Newfoundland law is the law of another nation. The law of Okinawa cannot now be modified in any way by any government but the United States.[22] By the law of nations, it may be said that the United States has the right—and certainly the United States has the power—to abrogate all the existing tort law of Okinawa and substitute an entirely new tort law.[23] Indeed, the argument might be advanced that the law of Okinawa at the time of conquest owes its continued existence to the

---

18. United States v. Spelar, 1949, 338 U. S. 217, 221, 70 S.Ct. 10, 12, 94 L.Ed. 3.
   In an article entitled Suits on Tort Claims against the United States, 1948, 7 F.R.D. 689, 695, Judge Hulen, without citing authority, has suggested that this exception was provided "probably because of the difficulty of obtaining evidence and necessity of providing rules of law to govern such liability." These points, if they were to be given weight despite the Spelar opinion, would not be very helpful in deciding whether Okinawa should be treated like Guam or like leased property in Newfoundland, at least if the burden of proving the applicable law falls on the plaintiff. See United States v. Spelar, 1949, 338 U.S. 217, 218, note 3, 70 S.Ct. 10.

19. Cf. Philippine Sugar Estates Development Co. v. United States, 1904, 39 Ct. Cl. 225, 247, quoted in part in 1 Hackworth, Digest of International Law (1940), p. 156; Colby, op. cit. supra, note 14, p. 151.

20. Panama Railroad Co. v. Bosse, 1919, 249 U.S. 41, 44, 39 S.Ct. 211, 63 L.Ed. 466; American Insurance Co. v. Canter, 1828, 1 Pet. 511, 542, 7 L.Ed. 242.

21. Vilas v. Manila, 1911, 220 U.S. 345, 357, 31 S.Ct. 416, 55 L.Ed. 491; Ortega v. Lara, 1906, 202 U.S. 339, 342, 26 S. Ct. 707, 50 L.Ed. 1055; Mitchel v. United States, 1835, 9 Pet. 711, 734, 9 L. Ed. 283; 1 Hyde, International Law § 122 (1922); 1 Hackworth, Digest of International Law, § 79 (1940).

22. See the Order of the Supreme Commander quoted at note 3, supra; United States v. Rice, 1819, 4 Wheat. 246, 254, 4 L.Ed. 562; City of New Orleans v. Steamship Co., 1874, 20 Wall. 387, 393–394, 22 L.Ed. 354; Mr. Justice Hunt, concurring, 20 Wall. at page 397, quoting Halleck on International Law; 2 Hyde, International Law § 690 (1922); Cf. 6 Hackworth, Digest of International Law, 398 (1943).

23. Dooley v. United States, 1901, 182 U. S. 222, 230–231, 21 S.Ct. 762, 45 L.Ed. 1074, quoting Halleck on International Law; General Order No. 101, War Department, Adjutant General's Office, July 18, 1898, quoted in Ochoa v. Hernandez, 1913, 230 U.S. 139, 155, note 1, 33 S. Ct. 1033, 57 L.Ed. 1427. Cf. 26 Ops. Att'y Gen. 113, 118 (1907); Opinion of Legal Adviser of Department of State, May 7, 1936, quoted in part in 1 Hackworth, Digest of International Law (1940), p. 156; Colby, Occupation under

will of the United States, which has impliedly adopted that law.[24] In this view the law of Okinawa is not the law "of a foreign power," but the law of the United States; the congressional objection to subjecting the United States to unforeseeable liability based on the laws of other sovereigns, over which the United States has no control, would be inapplicable.

The power of the belligerent occupant is not relevant in this proceeding, however, if the rights and duties are clear. Assuming that the United States once had an unlimited right to revise the tort law of occupied countries, that right was abandoned with the Hague Convention of 1907, to which the United States was a signatory. Article 43, as translated in the United States statutes-at-large, provides:

"The authority of the legitimate power having in fact passed into the hands of the occupant, the latter shall take all the measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country." [25]

In signing this treaty the United States has undertaken a duty, in cases to which the Hague Convention is applicable, to maintain the tort law of the occupied country.[26] It appears to be generally conceded that this Article was originally applicable to the occupation of Okinawa by the United States.[27] Despite the fact that hostilities have long since ceased, that occupation cannot be regarded as anything but a "belligerent occupation," within the scope of Article 43, until the terms of peace have been finally settled by treaty, proclamation, or otherwise.[28]

But if we assume, as has been ably argued, that Article 43 did not in terms restrict the legislative authority of the United

the Laws of War, 25 Col.L.Rev. 904, 916 (1925).

24. Cf. 26 Ops. Att'y Gen. 113, 118 (1907); Shapleigh v. Mier, 5 Cir., 1936, 83 F.2d 673, 676; Cross v. Harrison, 16 How. 164, 193, 14 L.Ed. 889;
Apparently a military proclamation formally adopted the existing civil law of Germany, except as modified by the occupation authorities. Fahy, Legal Problems of German Occupation, 47 Mich. L.Rev. 11, 14, citing U.S.M.G. Proclamation 2, Sept. 19, 1945, Military Gazette, Issue A, p. 2 (1946). The parties to this case have not referred to any comparable proclamation concerning Okinawa.

25. 36 Stat. 2277, 2306; 2 Malloy, Treaties 1910, 2269, 2288. The French text, described by Schwenk as "authoritative," is: "L'autorité du pouvoir légal ayant passé de fait entre les mains de l'occupant, celui-ci prendra toutes les mesures qui dépendent de lui en vue de rétabl'r et d'assurer, autant qu'ilest possible, l'ordre et la vie publics en respectant, sauf empêchement absolu, les lois en vigueur dans le pays." The words "public order and safety," in the "semi-official" translation, have always been inaccurate, for the French appears to contemplate restoring all the aspects of the daily civil life of the occupied country, including presumably the duties imposed by the local law of torts. See Schwenk, Legislative Power of the Military Occu-

pant under Article 43, Hague Regulations, 54 Yale L.J. 393, n. 1.

26. See Schwenk, op. cit. supra, note 24, pp. 399–402; 2 Hyde, International Law § 690 (1922); 2 Oppenheim, International Law § 169 (1906); 6 Hackworth, Digest of International Law § 587 (1943); 2 Garner, International Law and the World War 77, 85, (1920); Colby, Occupation under the Laws of War, 26 Col.L.Rev. 146, 151 (1926).
Cf. Rules of Land Warfare 285–88, Basic Field Manual (FM 27–10, 1940), discussed in the foregoing treatises.

27. Schwenk, writing in 1945, seems to assume that Article 43 applies generally to belligerent occupations arising out of military operations in World War II. See 54 Yale L.J., pp. 407–08. Both Fahy and Rheinstein appear to assume that Article 43 governed the United States occupation of Germany at least until the unconditional surrender of the German forces. Fahy, Legal Problems of German Occupation, 47 Mich.L.Rev. 11; Rheinstein, The Legal Status of Occupied Germany, 47 Mich.L.Rev. 23, 27 (1948).

28. American Insurance Co. v. Canter, 1828, 1 Pet. 511, 542, 7 L.Ed. 242; Rheinstein, The Legal Status of Occupied Germany, 47 Mich.L.Rev. 23, 27 (1948); Colby, Occupation Under the Laws of War, 25 Col.L.Rev. 904, 905, 910 et seq.; 2 Hyde, International Law

States Military Government in Okinawa in 1948, that article merely expresses "the modern usage of nations, which has become law * * * that sense of justice and of right which is acknowledged and felt by the whole civilized world." [29] At least until the occupant has determined upon the ultimate disposition of the occupied territory, the occupant has the right to legislate only in the interest of the safety of the occupying power or in the interest of the welfare of the inhabitants of the occupied territory; the occupant lacks authority to legislate at will, in disregard of the spirit and traditions of the occupied territory. For example, suppose that the pre-war tort law of Okinawa was based on a doctrine of "strict" liability without fault, and that the United States Military Government, fearing excessive liability under the Federal Tort Claims Act, attempted to abrogate that principle and substitute a doctrine of liability based on fault. Such a change, in disregard of the legitimte interests of the inhabitants, would violate the "dictates of the public conscience," [30] as well as the spirit, if not the letter, of Article 43.

It follows that the United States Military Government was not free to alter the tort law of Okinawa at will, but was bound to maintain the pre-existing "foreign" law. Since Congress was unwilling to subject the United States to liability based on that sort of law, the action was properly dismissed.

Judgment affirmed.

§ 689 (1922), relying upon Rule 294 of the Rules of Land Warfare; Cf. id. at § 904 et seq.; 2 Oppenheim, International Law § 231 (1906); 6 Hackworth, Digest of International Law § 590 (1943).

Contra: Fahy, Legal Problems of German Occupation, 47 Mich.L.Rev. 11, 13 (1948).

See United States v. Huckabee, 1872, 16 Wall. 414, 434–435, 21 L.Ed. 457.

29. United States v. Percheman, 1833, 7 Pet. 51, 86–87, 8 L.Ed. 604. Cf. Opinion dated March 17, 1947, printed in 7 Selected Opinions of the Office of Military Government for Germany (U.S.) 115, 122; Stein, Application of the Law of the Absent Sovereign in Territory under Belligerent Occupation: The Schio Massacre, 1948, 46 Mich.L.Rev. 341; Rheinstein, loc. cit. supra, note 27.

On Rehearing

The petition for rehearing is denied.

POPE, Circuit Judge.

I concur in the action of the Court in denying the petition for rehearing. The petition for rehearing calls to our attention the necessity of a re-examination of our former conclusion as to the applicability of Article 43 of the Hague Convention of 1907 upon which our decision of June 11, 1951, was predicated. The sources of information mentioned in the petition would indicate that in the Ryukyu Islands, as well as in Germany and in Japan, the United States Military Government, with the approval of the State Department, has promulgated regulations relating to traffic and operation of motor and other vehicles. Thus, departments of the Government, whose judgment we are not authorized to review, have taken a position with respect to Article 43 contrary to that suggested in our first opinion.

The majority of the Court have now proposed to amend the opinion to eliminate the reliance upon Article 43 and to substitute other language, and upon this amendment of the opinion to deny the petition for rehearing. I cannot bring myself to believe that the opinion in the amended form establishes a sound reason for the conclusion reached.

The case presents, I think, much more difficulty than did United States v. Spelar, 338 U.S. 217, 70 S.Ct. 10, 11, 94 L.Ed. 3.

30. Foreseeing the possibility that the Hague Regulations might be narrowly construed in particular cases, the contracting parties provided in the preamble to the Regulations: "Until a more complete code of the laws of war has been issued, the High Contracting Parties deem it expedient to declare that, in cases not included in the Regulations adopted by them, the **inhabitants** and the belligerents **remain under the protection** and the rule of the principles **of the law of nations** as they result from the usages established among civilized peoples, from the laws of humanity, and the dictates of the public conscience." 36 Stat. 2279–80, 2 Malloy, Treaties 1910, p. 2272. [Emphasis added]

There the court was able to say: "Sufficient basis for our conclusion lies in the express words of the statute." The court proceeded to conclude that the accident on the Newfoundland airfield was one "arising in a foreign country", because the territory there was clearly subject to the sovereignty of another nation.

It was pointed out in our original opinion that as concerns Okinawa, this "test of sovereignty" furnishes no solution here. The court therefore proceeded to consider some of the other things said in the Spelar case where the court, after consideration of some of the legislative history of the Federal Tort Claims Act came to the conclusion that the exception here applied was inserted in order to avoid subjecting "the United States to liabilities dependent upon the laws of a foreign power." The court then proceeded to test the application of the Tort Claims Act by this summarization of the Congressional motive which the Supreme Court evolved from the legislative history.

I feel that the application of this test has led the court into unnecessary difficulties. What we are doing is not applying the precise language of the Act, but rather a summarization of the legislative history. I have in mind all that Mr. Justice Jackson said in his concurring opinion in Schwegmann Bros. v. Calvert Distillers Corp., 1951, 341 U.S. 384, 71 S.Ct. 745, 751, that "Resort to legislative history is only justified where the face of the Act is inescapably ambiguous * * *."

I am of the opinion that the conclusion at which we have arrived is the only possible one here for the simple reason that I think it is impossible to conclude that Okinawa was anything other than a "foreign country" within the meaning of the exception here involved. Plainly, the term "foreign country" is not self-defining, and it is not as definite as a description of weights and measures. It does not mean the same thing today that it meant in generations past, but I think that any person charged with the specific question here involved cannot arrive at any conclusion other than that Okinawa must be held to be within the meaning of the words "foreign country" as used in the Tort Claims Act.

In arriving at that conclusion, it is not easy to call to mind any pat test. It seems to me that arriving at this conclusion is merely a matter of common sense. I am impressed by what Judge Yankwich said in Hichino Uyeno v. Acheson, D.C., 96 F. Supp. 510, 515, as follows: " * * * it is obvious that the words 'foreign state' are not words of art. In using them, the Congress did not have in mind the fine distinctions as to sovereignty of occupied and unoccupied countries which authorities on international law may have formulated. They used the word in the sense of 'otherness'. When the Congress speaks of 'foreign state', it means a country which is not the United States or its possession or colony,—an alien country,—other than our own, bearing in mind that the average American, when he speaks of a 'foreigner' means an alien, non-American. * * * So here, the interpretation called for is that of common speech and not that derived from abstract speculation on sovereignty as affected by foreign military occupation."

Since I assume that Congress was using the words here involved as those "of common speech", and that so considered the Island of Okinawa would come within them, I think that this action cannot be maintained for the simple reason that it is excluded by the express terms of the Act.