**UNITED STATES**
v.
**USHI SHIROMA.**
Cr. No. 10841.

United States District Court
D. Hawaii.
Aug. 12, 1954.

A. William Barlow, U. S. Atty., Dist. of Hawaii, Honolulu, Hawaii, for plaintiff.

Kashiwa & Kashiwa, Shiro Kashiwa, Honolulu, Hawaii, for defendant.

McLAUGHLIN, Chief Judge.

As in this criminal case it became necessary to decide whether, under the Treaty of Peace with Japan, Okinawa, Ryukyu Islands, is an area in the Pacific to which our nation's sovereignty has been extended, the Findings and Conclusions orally made on July 27, 1954, are here recorded.

On May 6, 1954, an information was filed against the defendant, wherein he was charged with violating 8 U.S.C.A. § 1306(b), a misdemeanor. The information alleged that the defendant was an alien and that he failed "to notify the Attorney General in writing of his current address and furnish such additional information as is by regulations required by the Attorney General" within thirty days following January 1, 1954, See 8 U.S.C.A. § 1305. To this charge, the defendant pleaded not guilty on June 3, 1954.

This case was tried jury-waived. Following the hearing of the evidence, argument was deferred until after briefs were filed, and on July 27, 1954, the Court pronounced the defendant guilty as charged.

Findings of Fact.

Under Rule 23(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., the Court finds the facts specially as follows:

1. The defendant was born at Aza Onaga, Nishihara Mura, Nakagami Gun, Okinawa, Ryukyu Islands, on August 14, 1897.

2. His father and mother were Okinawans, born in Okinawa.

3. He came to the Territory of Hawaii on January 9, 1913, and has been a legal resident of the Territory since that date.

4. Since his entry in 1913, he has never been naturalized as a citizen of the United States.

5. In 1940, he registered as an alien as required by the Alien Registration Act 1940, 54 Stat. 670.

6. On January 1, 1954, he resided in the County of Honolulu, Territory of Hawaii. Such residence continued to June 28, 1954, the date of trial.

7. He failed to notify the Attorney General in writing of his current address and furnish such additional information as is by regulations required by the Attorney General within thirty days following January 1, 1954.

### Conclusions of Law.

From the above findings of fact, the Court concludes as follows:

1. The Court has jurisdiction in this case.

2. The defendant was an alien on January 1, 1954. Consequently, he was required by 8 U.S.C.A. § 1305 to notify the Attorney General in writing of his current address within thirty days following January 1, 1954.

3. Having failed to do so, he is guilty as charged in the information of violating 8 U.S.C.A. § 1306(b).

### Opinion.

A novel defense interjected at trial raised the legal question of whether the defendant was an alien in January 1954, the time of the alleged offense.

The defendant ingeniously argued that, because of events occurring subsequent to World War II, Okinawa became a possession of the United States. Thus, being a native of Okinawa, although residing in Hawaii, the defendant became a national of the United States. Consequently, not being an alien, he was legally incapable of committing the offense charged in the information.

Initially, the definitions found in the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1101 et seq., are helpful. Section 1101(a)(3) provides:

"The term 'alien' means any person not a citizen or national of the United States."

The term "national of the United States" is defined in Section 1101(a)(22) as follows:

"The term 'national of the United States' means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States."

Although the defendant admits that he is not a citizen of the United States, the question remains whether he is a national of the United States. In other words, does the defendant owe permanent allegiance to the United States?

Permanent allegiance is a correlative of the concept of sovereignty. Whether the defendant owes permanent allegiance to the United States depends on whether American sovereignty extends over Okinawa.

Sovereignty may be defined broadly as the "supreme will." See United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 317, 57 S.Ct. 216, 81 L.Ed. 255; Cobb v. United States, 9 Cir., 1951, 191 F.2d 604, 608, certiorari denied, 1952, 342 U.S. 913, 72 S.Ct. 360, 96 L. Ed. 683. This case, indeed, lends support to the statement that the "concept of 'sovereignty' is in a state of more or less solution these days." United States v. Spelar, 1949, 338 U.S. 217, 224, 70 S.Ct. 10, 13, 94 L.Ed. 3. Recently, the Ninth Circuit endorsed this observation in Cobb v. United States, supra, 191 F.2d at page 608. Be that as it may, sovereignty *is*, and this justiciable controversy requires a judicial determination.

█ Okinawa is an island in the Ryukyu Archipelago. It can be judicially noticed that, prior to World War II, Japan had sovereignty over the Ryukyus. During World War II, the United States conquered and occupied Okinawa. Such occupation continued and was effective at the time the Treaty of Peace with Japan was signed on Sep-

tember 8, 1951. U.S.Code Cong. & Adm. Service, 1951, pp. 2730–2748. The Treaty of Peace was subsequently ratified by the United States Senate on March 20, 1952. 98 Cong.Rec. 2594.

Prior to the signing of the Treaty of Peace, the courts deemed Okinawa a "foreign country" within the meaning of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680. See Cobb v. United States, supra; Brewer v. United States, D.C.N.D.Cal.1948, 79 F.Supp. 405. In the Cobb case, the court stated, 191 F.2d at page 608, as follows:

"The United States has * * * acquired, and still retains, what may be termed a 'de facto sovereignty' [over Okinawa].

"However, the traditional 'de jure sovereignty' has not passed to the United States. The conqueror does not acquire the full rights of sovereignty merely by occupying and governing the conquered territory without a formal act of annexation or at least an expression of intention to retain the conquered territory permanently."

■ The question then is whether the United States acquired the traditional "de jure sovereignty" over Okinawa under the Treaty of Peace. Our concern is solely with "de jure sovereignty," because only this time-tested yardstick of international law should be applied in determining the status of a geographical area and its inhabitants. In other words, permanent allegiance is owed only to a "de jure sovereign."

The pertinent part of the Treaty of Peace is Article 3, which reads as follows:

"Japan will concur in any proposal of the United States to the United Nations to place under its trusteeship system, with the United States as the sole administering authority, Nansei Shoto south of 29° north latitude (including the Ryukyu Islands and the Daito Islands), Nampo Shoto south of Sofu Gan (including the Bonin Islands, Ro-sario Island and the Volcano Islands) and Parece Vela and Marcus Island. Pending the making of such a proposal and affirmative action thereon, the United States will have the right to exercise all and any powers of administration, legislation and jurisdiction over the territory and inhabitants of these islands, including their territorial waters."

The defendant baldly contends that under Article 3 the United States acquired sovereignty over Okinawa, Ryukyu Islands. To this, the Court cannot subscribe.

■ Sovereignty over a territory may be transferred by an agreement of cession. See 1 Hackworth, Digest of International Law 421 (1940). Here neither in Article 3 nor in any other article of the Treaty of Peace does Japan *cede* Okinawa to the United States. In Article 2, Japan formally "renounces all right, title and claim" to certain specified territories, including Korea, Formosa and the Kurile Islands. However, there is no such renunciation as to the territories named in Article 3.

■ On September 5, 1951, John Foster Dulles, who as a consultant to the Secretary of State was instrumental in negotiating the treaty, made a speech at the Conference for the Conclusion and Signature of the Peace Treaty with Japan. See 25 Dept. State Bulletin 452–9 (1951). At that time, Mr. Dulles in explaining the principal provisions of the treaty made the following statement:

"Article 3 deals with the Ryukyus and other islands to the south and southeast of Japan. These, since the surrender, have been under the sole administration of the United States.

"Several of the Allied Powers urged that the treaty should require Japan to renounce its sovereignty over these islands in favor of United States sovereignty. Others sug-

gested that these islands should be restored completely to Japan.

"In the face of this division of Allied opinion, the United States felt that the best formula would be to permit Japan to retain *residual sovereignty*, while making it possible for these islands to be brought into the U.N. trusteeship system, with the United States as administering authority." (Emphasis added.) Id. at p. 455.

The reasonable construction of treaty terms by the State Department, acquiesced in by the other signatory powers, is entitled to great weight. United States v. Reid, 9 Cir., 1934, 73 F.2d 153, 156, certiorari denied, 1936, 299 U.S. 544, 57 S.Ct. 44, 81 L.Ed. 400. Thus Mr. Dulles' construction of Article 3, as opposed to defendant's contentions, is very persuasive.

Furthermore, to the Government's reply brief is attached a copy of a letter dated May 14, 1952, addressed to a Mr. Overton from the Legal Adviser of the Department of State.

The letter states in part as follows:

"1. A legal opinion is requested on the request of the Japanese Vice Minister for Foreign Affairs dated 10 December 1951, that the United States confirm that the 'Southern Islands' (the Ryukyus and the Bonins) remain under the sovereignty of Japan and that their inhabitants remain Japanese nationals.

\*   \*   \*   \*   \*   \*

"6. It is concluded that sovereignty over the Ryukyu and Bonin Islands remains in Japan, and that the inhabitants thereof are Japanese nationals."

"Residual sovereignty" referred to by Mr. Dulles is a concept difficult to define. The defendant analogizes "residual sovereignty" to a "future interest" and conceives it to mean that sovereignty is to arise *in futuro*. Therefore, he argues, under Article 3, "present sovereignty," the antithesis of "residual sovereignty," is in the United States, making him a "national." However, under the law of property, a holder of a "future interest" presently has a bundle of rights, privileges and duties, although the right of possession or enjoyment is postponed until the future. See 1 Simes, Law of Future Interest 2–3 (1936). Moreover, the importation of the niceties from the law of property into the field of international law confuses rather than aids in resolving the instant problem. See Justice Frankfurter's comments concerning the application of the "unwitty diversities of the law of property" in estate tax cases in Helvering v. Hallock, 1940, 309 U.S. 106, 118, 60 S.Ct. 444, 450, 84 L.Ed. 604.

The adjective "residual" means of the nature of something left as residue. Thus the concept of "residual sovereignty" starts with the assumption that sovereignty is capable of division.

Under Article 3 of the Treaty of Peace, Japan which previously had full sovereignty over Okinawa transferred a part of that sovereignty, while retaining the residue. That portion of the sovereignty which gives the United States "the right to exercise all and any powers of administration, legislation and jurisdiction" under Article 3 may be labeled "de facto sovereignty." The residue or "residual sovereignty" retained by Japan is the traditional "de jure sovereignty." What the situation will be when the United States, under Article 3, makes a proposal to the United Nations to place Okinawa under its trusteeship system and affirmative action is taken thereon is not presently material.

Japan, and not the United States, having "de jure sovereignty" over Okinawa since the ratification of the Treaty of Peace, the defendant is not a national of the United States. Being therefore an alien, he was required to give the Attorney General written notice of his current address within a specified time as directed by 8 U.S.C.A. § 1305.

**150**

For the reasons stated above, the defendant was adjudged guilty of violating 8 U.S.C.A. § 1306(b). However, due to his age and the fact that he belatedly met the requirements of 8 U.S.C.A. § 1305 on April 28, 1954, imposition of sentence was suspended and the defendant granted probation, as reflected by the judgment.