**Peggy Sue BIRD**

v.

**UNITED STATES of America.**

**Civil No. 394cv1850 (JBA).**

United States District Court, D. Connecticut.

March 8, 1996.

Susan Mara Phillips, Richard A. Schatz, Suisman Shapiro Brennan Wool & Gray, P.C., New London, CT, for plaintiff.

Carl J. Schuman, Office of the U.S. Attorney, Hartford, CT, for defendant.

### RULING ON DEFENDANT'S MOTION TO DISMISS

ARTERTON, District Judge.

## I. Introduction

On November 2, 1994, Plaintiff Peggy Sue Bird filed this action against the defendant United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq.*, claiming medical malpractice by physicians responsible for her care and treatment at the United States Naval Medical Facility, Guantanamo Bay, Cuba in October 1992.

Defendant has moved to dismiss under Fed.R.Civ.P. 12(b)(1) on the grounds that plaintiff's action claiming tortious acts or omissions occurring at the United States Naval Facility at Guantanamo Bay, Cuba, is barred by the "foreign country" exclusion under the FTCA and this Court lacks subject matter jurisdiction over this action.

The Court entertained oral argument on this motion on February 15, 1996. For the reasons stated below, this Court grants defendant's motion to dismiss.

## II. Facts

In her complaint, Plaintiff Bird states that she was a civilian dependent of her husband David R. Bird, who was an active member of the United States Navy. On or about October 28, 1992, Ms. Bird was seen at the United States Medical Facility at Guantanamo Bay, Cuba[1] for complaints of a tremor in her left upper arm. Plaintiff alleges that the hospital's attending physician, Dr. Richard L. Rosseau, was negligent in failing to make a timely and proper diagnosis of her condition, which was subsequently diagnosed by physicians at the United States Naval Hospital in Groton, Connecticut on November 9, 1993 as a brain tumor known as an astrocytoma.

Plaintiff Bird charges that as a result of the defendant's negligence, the plaintiff's neurological pathology was undetected for over a year, causing her to experience continued abnormal neurological symptomology, extreme emotional distress and permanent physical injury and, potentially, premature death.

## III. Discussion

The Defendant United States of America has filed a motion to dismiss on the grounds that this Court lacks subject matter jurisdiction over this matter because the plaintiff cannot maintain a cognizable claim under the FTCA. *See* Fed.R.Civ.P. 12(b)(1). The subject matter jurisdiction of federal district courts is limited to all civil actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "Once challenged, the burden of establishing a federal court's jurisdiction rests on the party asserting subject matter jurisdiction." *Commonwealth Land Title Ins. Co. v. United States* 759 F.Supp. 87, 90

---

1. The U.S. Naval Station, Guantanamo Bay, Cuba is the oldest U.S. military installation outside the United States. Ronald O'Rourke & Mark P. Sullivan, "Guantanamo Bay Naval Base, Cuba: Background and Current Issues," *Congressional Research Service Report for Congress* (Sept. 2, 1994). The land area of Guantanamo Bay covers an area of thirty-one square miles, "an area larger than Manhattan and nearly half the size of the District of Columbia." Harold Hongju Koh, "America's Offshore Refugee Camps," 29 *U.Rich.L.Rev.* 139 (1994). Exclusive of refugees, as of July 31, 1994, the total population of the military facility was 5,431 including U.S. military personnel and their dependents, U.S. civilian employees and their dependents, and 1,133 foreign nationals employees (mostly Jamaicans) and their dependents. O'Rourke & Sullivan, *supra* (citing U.S. Dep't of Navy, "Base Population Statistics as of 31 Jul 94.")

(D.Conn.1991). "If a district court lacks subject matter jurisdiction, dismissal of the action is mandatory." *Manway Const. Co. v. Housing Authority. of the City of Hartford,* 711 F.2d 501, 503 (2d Cir.1983).

■ The United States may only be sued if it waives its sovereign immunity. *See United States v. Nordic Village, Inc.,* 503 U.S. 30, 112 S.Ct. 1011, 1014, 117 L.Ed.2d 181 (1992). In enacting the Federal Tort Claims Act in 1946, Congress granted a limited waiver to the government's immunity for complaints involving injuries "caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). The FTCA, however, expressly exempts from its coverage "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k). The plaintiff has not offered any evidence of Congressional intent to apply the FTCA to claims arising in Guantanamo. *See Smith v. United States,* 507 U.S. 197, at 203–205, 113 S.Ct. 1178, at 1183, 122 L.Ed.2d 548 (1993) (quoting *United States v. Kubrick,* 444 U.S. 111, 117–118, 100 S.Ct. 352, 356–357, 62 L.Ed.2d 259 (1979) ("[while the FTCA] waives the immunity of the United States, ... we should not take it upon ourselves to extend the waiver beyond that which Congress intended.").

■ The United States asserts that since the alleged negligence occurred in Cuba, even though it was on the grounds of a United States military facility, plaintiff's claim is barred under the "foreign country" exception of § 2680(k). *See United States v. Spelar,* 338 U.S. 217, 70 S.Ct. 10, 94 L.Ed. 3 (1949) (barring claim arising at United States leased air base in Newfoundland); *Roberts v. United States,* 498 F.2d 520 (9th Cir.), *cert. denied,* 419 U.S. 1070 95 S.Ct. 656, 42 L.Ed.2d 665 (1974) (medical malpractice claim arising at U.S. air base in Okinawa, Japan barred); *Rafftery v. United States,* 150 F.Supp. 618 (E.D.La.1957) (medical malpractice at army hospital in Germany barred); *Broadnax v. U.S. Army,* 710 F.2d 865 (D.C.Cir.1983) (slip and fall at United States Army base in Germany not actionable under FTCA); *Pelphrey v. United States,* 674 F.2d 243 (4th Cir.1982) (barring malpractice claim at U.S. Navy hospital in Philippines).

The plaintiff attempts to distinguish the above precedents by arguing that the Guantanamo Bay Naval Facility has a unique territorial status.[2] In 1903, President Theodore Roosevelt signed an agreement with the President of the newly-established Republic of Cuba, authorizing the United States to lease the area of Guantanamo to establish coaling or naval stations in order "to enable the United States to maintain the independence of Cuba, and to protect the people thereof, as well as for its own defense."[3] Lease of Lands for Coaling and Naval Stations, February 16–23, 1903, U.S.–Cuba, T.S. 418 (quoting 31 Stat. 898) (hereinafter, "Lease of Lands Agreement").

Later in 1903, pursuant to the requirements of U.S. Const. Art. II, § 2, the United States entered into a general relations treaty with Cuba which included a provision requiring the Cuban government to sell or lease land to the United States necessary for coaling or naval stations.[4] Relations with Cuba,

---

**2.** Cuba was a colony of Spain until 1898. Following Spain's signing of the Treaty of Paris, which ended the Spanish–American War, the United States administered the island for three years, until Cuba declared its independence on May 20, 1902. U.S. Dep't of State, "Fact Sheet: Cuba," February 22, 1993 *available in* Westlaw, 1993 WL 2977391.

**3.** The legal authority for the lease of Guantanamo is found in the so-called Platt Amendment, passed by Congress in 1901 and adopted as an appendix to the Cuban constitution. *See* 31 Stat. 895 (1901); Constitution [1902] Appendix, art. VII (Republic of Cuba).

**4.** The Treaty quoted the terms of the Platt Amendment, which stated in part:

> ... "For the recognition of the independence of the people of Cuba, demanding that the Government of Spain relinquish its authority and government in the island of Cuba, and to withdraw its land and naval forces from Cuba and Cuban waters, and directing the President of the United States to use the land and naval forces of the United States to carry those resolutions into effect," the President is hereby authorized to "leave the government and control of the island of Cuba to its people" so soon as a government shall be established in said island ...

May 22, 1903, U.S.–Cuba, T.S. 437. In 1934, the 1903 Relations with Cuba Treaty was abrogated by the United States and Cuba and replaced with a new treaty which explicitly reaffirmed the continued validity of the 1903 Lease of Lands Agreement, providing for the lease of Guantanamo. *See* Relations with Cuba, May 29, 1934, U.S.–Cuba, T.S. 866.

Plaintiff points to the finite lease term at issue in *Spelar* as providing a dispositive contrast with the perpetual lease of Guantanamo Bay, terminable only by mutual agreement of the two countries, or by abandonment of Guantanamo by the United States. Based on the lease's term, "complete jurisdiction and control," the plaintiff reasons that the United States has *de facto* sovereignty over Guantanamo Bay and that the FTCA exclusion should not bar plaintiff's claim. *See Cobb v. United States*, 191 F.2d 604 (9th Cir.1951) (finding United States as "de facto sovereign" of the Island of Okinawa following World War II).

 Although the current government in Cuba may not recognize these treaties,[5] the 1903 agreement does remain in effect. The 1934 treaty mandates that the 1903 lease agreement is valid unless terminated by mutual agreement or by unilateral abandonment by the United States. Relations with Cuba (1934), art. III. However, this Court's research locates no proclamation or declaration from the President or any executive agency renouncing these treaties. Rather, based on

the Court's independent research, it concludes that the United States government continues to recognize the validity of these treaties.[6] *See* U.S. Dep't of State, *Treaties in Force* (1995); U.S. Dep't of State, "Fact Sheet: Cuba," *supra* (the 1934 reaffirmation of the 1903 Lease of Lands Agreement "remains in force today"). The fact that the United States does not provide diplomatic recognition of the present Cuban government does not bar the validity of the treaties it previously entered into with this sovereign nation. *See New York Chinese TV Programs, Inc. v. U.E. Enterprises, Inc.*, 954 F.2d 847 (2d Cir.1992), *cert. denied*, 506 U.S. 827, 113 S.Ct. 86, 121 L.Ed.2d 49 (1992) (United States's derecognition of Taiwan did not change Taiwan's status as a nation and the validity of United States treaties with it).[7]

The determinative question before the Court on this Motion to Dismiss is whether Guantanamo Bay is in a "foreign country," or is considered part of the United States for purposes of maintaining an action under the FTCA. The FTCA does not provide a definition for the term "foreign country," but the Supreme Court has defined the term as a "territory subject to the sovereignty of another nation." *U.S. v. Spelar*, 338 U.S. at 219, 70 S.Ct. at 11 (citing *De Lima v. Bidwell*, 182 U.S. 1, 180, 21 S.Ct. 743, 746, 45 L.Ed. 1041 (1901)); *See Smith v. United States*, 507 U.S. 197, 203–205, 113 S.Ct. 1178, 1183, 122 L.Ed.2d 548 (1993) (offering an additional definition of "country" as "[a] region or tract of land").[8]

Relations with Cuba, May 22, 1903, U.S.–Cuba, T.S. 437 (quoting 31 Stat. 895 (1901)).

5. Fidel Castro has often referred to the American presence at Guantanamo as "illegal" and an example of "Yankee Imperialism." "Thousands of Americans at Gitmo," *U.S. News & World Report*, Sept. 24, 1979, p. 28. In 1994, Cuba's Ambassador to the United Nations Fernando Remirez called Guantanamo Base "a piece of Cuban soil usurped by the United States against the will of the Cuban people." Robert L. Koenig, "Navy Base Labors to Keep Up with Influx," *St. Louis Post–Dispatch*, Aug. 25, 1994, 1994 WL 8180883.

6. In fact, the United States sends an annual rent payment of $4,085 to the Cuban government. Cuba has not cashed these checks since the year after Fidel Castro took power. *See* Jim Wolf,

"U.S. Pays Cuba $4,085 Yearly for Leased Guantanamo Base," *Rocky Mountain News*, Aug. 25, 1994, 1994 WL 6673251.

7. As of 1992, the United States did not accord diplomatic recognition to but honored at least one treaty with the following countries: Albania, Cambodia, Taiwan, Cuba, Iran, Libya, and Vietnam. *New York Chinese TV Programs, Inc.*, 954 F.2d at 852.

8. In *Smith v. United States*, the Supreme Court found that the FTCA "foreign country" exception barred a claim arising at a United States station in Antarctica, even though Antarctica has no recognized government. In reaching its decision, the Supreme Court refused to establish only one definition for the term "country." The Court rejected petitioner's argument that "country" should only be equated with "sovereign

The Court begins its analysis of Guantanamo Bay's "sovereignty" by reviewing the terms of the still-valid lease. The 1903 lease agreement provides:

> While on the one hand the United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba over the above described areas of land and water, on the other hand the Republic of Cuba consents that during the period of the occupation by the United States of said areas under the terms of this agreement the United States shall exercise complete jurisdiction and control over and within said areas with the right to acquire (under conditions to be hereafter agreed upon by the two Governments) for the public purposes of the United any land or other property therein by purchase or by exercise of eminent domain with full compensation to the owners thereof.

Lease of Lands Agreement, art. III.

While the United States has complete control and jurisdiction over Guantanamo Bay, the agreement unequivocally states that the leased land is subject to the ultimate sovereignty of Cuba. See Vermilya–Brown Co. v. Connell, 335 U.S. 377, 384 n. 6, 69 S.Ct. 140, 144 n. 6, 93 L.Ed. 76 (1948) (citations omitted) (the Isthmanian Canal Convention granted the United States the right to possess and exercise the Panama Canal Zone as if it " 'were the sovereign of the territory ... to the entire exclusion of the exercise of the Republic of Panama of any such sovereign rights, power or authority.' "). Because Cuba currently has no recognizable power over the territory, plaintiff's counsel at oral argument equated the status of an "ultimate sovereign" to a person holding a remainder interest in a leasehold. See Robert D. Powers, Jr., "Caribbean Leased Bases Jurisdiction", *JAG J.* 161, 166 (Oct.–Nov. 1961),

("[S]overeignty [over Guantanamo Bay] without the right to control and exercise jurisdiction is at most a 'titular' sovereignty."). Plaintiff argues that *de facto* sovereignty over Guantanamo Bay rests with the United States due to its past and continued exercise of exclusive control and administration over the area. See *Cobb v. United States, supra.*

The Court does not find the Ninth Circuit's discussion of *de facto* sovereignty in *Cobb* to be relevant in this case. In *Cobb,* the United States was sued under the FTCA for tortious acts occurring on Okinawa following World War II. At the time of the plaintiff's alleged injury and the issuance of the Ninth Circuit's decision, the United States Military Government occupied and administered the island, and a peace treaty had not yet been concluded with Japan regarding the sovereignty of the island. *Cobb,* 191 F.2d at 606. In the absence of a resolution on the ultimate disposition of the island, the court rejected the premise that the United States had acquired traditional "de jure sovereignty." *Id.* at 607. ("The conqueror does not acquire the full rights of sovereignty merely by occupying and governing the conquered territory without a formal act of annexation or at least an expression of intention to retain the conquered territory permanently."). However, the court did find that the United States was the *de facto* sovereign over the area because of the United States military's exclusive governance.[9] *Id.*

In contrast to the then-ambiguous legal status of post-war Okinawa, there is a valid treaty delineating the sovereignty rights over Guantanamo Bay. See *Burna v. United States,* 240 F.2d 720 (4th Cir.1957) (Okinawa found to be in a "foreign country" within meaning of FTCA in a action arising after

---

state," but instead, recognized that there can be more than one possible interpretation of "country" including "[a] region or tract of land." *Id.,* 507 U.S. at 201, 113 S.Ct. at 1181 (quoting *Webster's New International Dictionary* 609 (2d ed. 1945)).

For purposes of this motion, this Court will use the definition outlined by the Supreme Court in *Spelar* since there is no dispute that there is a cognizable government, either United States or Cuba, governing the land on which the plaintiff's

claim arose. See *Id.* at 209–211, 113 S.Ct. at 1186 (Stevens, J., dissenting) (urging the Court to only follow the *Spelar* definition of "foreign country" as "territory subject to the sovereignty of another nation.").

9. Although the United States was determined to be the *de facto* sovereign over Okinawa, the court found that plaintiff's FTCA claim was not actionable because Japanese tort law remained in effect on the island during the military occupation. *Cobb,* 191 F.2d at 607.

the signing of the 1951 peace treaty with Japan). Because the 1903 Lease of Lands Agreement clearly establishes Cuba as the *de jure* sovereign over Guantanamo Bay, this Court need not speculate whether the United States is the *de facto* sovereign over the area.[10] *See Cuban American Bar Ass'n Inc. v. Christopher*, 43 F.3d 1412, 1425 (11th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2578, 132 L.Ed.2d 828, *and cert. denied*, —— U.S. ——, 116 S.Ct. 299, 133 L.Ed.2d 205 (1995). ("We disagree that 'control and jurisdiction' is equivalent to sovereignty."). Since sovereignty over the Guantanamo Bay does not rest with the United States, the plaintiff's claim is barred under the "foreign country" exception of the FTCA.[11] *See Smith v. United States*, 507 U.S. at 203–205, 113 S.Ct. at 1183; *Hughes Aircraft Co. v. United States*, 29 Fed.Cl. 197, 231 (1993) (FTCA claim arising in outer space barred under "foreign country" exception due to the lack of U.S. sovereignty).

■ Finally, in an effort to circumvent the holding of *U.S. v. Spelar, supra,* that the exclusion applies if the claim arises in a foreign country and is predicated on foreign law, plaintiff has moved to amend her complaint to include an allegation that the Navy physicians failed to meet the standard of care that prevails in the United States. The plaintiff notes that the claim in *Spelar,* was premised under Newfoundland's law and the Supreme Court stated that in enacting the FTCA and abandoning, in part, the government's sovereign immunity, Congress was "unwilling to subject the United States to liabilities depending upon the laws of a foreign power." *Id.,* 338 U.S. at 221, 70 S.Ct. at 12.

Plaintiff's proposed amendment to her complaint, predicating her claim on United States law, however, does not alter the disposition of defendant's Motion to Dismiss. *See Manemann v. United States,* 381 F.2d 704, 705 (10th Cir.1967) (citing *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 590–591, 7 L.Ed.2d 492 (1962)) (FTCA claim dependant on Taiwan law but barred by the "foreign country" exception of Section 2680(k)). The FTCA provides that the United States shall be liable in tort "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Section 1346(b) does not provide an independent basis to establish the court's jurisdiction, but simply statutorily removes any conflict of law questions. *See, e.g., Kruchten v. United States,* 914 F.2d 1106, 1107 (8th Cir. 1990) ("The law of the state in which alleged tort occurred ... governs all substantive issues in Federal Tort Claims case."). Thus, the issue of whether the substantive law of the United States applies in this case has no bearing on the Court's jurisdiction.

## IV. Conclusion

For the reasons stated above, the Court dismisses plaintiff's claim for lack of subject matter jurisdiction.

IT IS SO ORDERED.

---

**10.** In addition, the fact that Cuba has been excluded from Guantanamo for over ninety years and that the government of Cuba changed in 1959 has no effect on Cuba's status as the "ultimate sovereign" of Guantanamo Bay. *See United States v. Curtiss–Wright Corp.,* 299 U.S. 304, 316–317, 57 S.Ct. 216, 219–220, 81 L.Ed. 255 (1936). ("Rulers come and go; governments end and forms of government change, but sovereignty endures.").

**11.** Although not asserted in this action, the defendant notes that Ms. Bird may have remedies under the Military Claims Act, 10 U.S.C. § 2733 (1993), subject to a $100,000 limit, for personal injuries or death "caused by a civilian officer or employee of the Department of Defense acting within the scope of his employment or otherwise incident to noncombat activities ..." *Id.* at § 2733(h).